**EXXON MOBIL CORPORATION,**
Appellant,

v.

**Dwight HINES and Shannon
Everett, Appellees.**

No. 14–06–00745–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 26, 2008.

Russell S. Post, David M. Rivet, Houston, for appellant.

Robert E. Lapin, Houston, for appellees.

Panel consists of Chief Justice HEDGES, Justice SEYMORE, and Former Justice PRICE.*

## OPINION

ADELE HEDGES, Chief Justice.

This is a double appeal in a lawsuit filed by appellees/cross-appellants, Dwight Hines and Shannon Everett (collectively "appellees"), alleging defamation and age discrimination against their former employer, appellant/cross-appellee, Exxon Mobil Corporation (hereinafter "Exxon"). In regards to the discrimination claims, the trial court granted summary judgment favoring Exxon. After trial on the defamation claims, a jury found that Exxon defamed appellees and awarded damages totaling $467,500. In its appeal, Exxon contends that (1) the allegedly defamatory statements were privileged as a matter of law; (2) the Texas employment at-will doctrine bars appellees' claims; (3) the employment at-will doctrine, at a minimum, prevents appellees from recovering economic damages under the facts of this case; (4) the evidence is legally insufficient to support the award of noneconomic damages; and in the alternative, (5) the trial court erred in its submission of the excessive publication issue to the jury. In their cross-appeal, Hines and Everett contend that the trial court erred in granting summary judgment against their age discrimination claims. We modify the trial court's judgment to render judgment that appellees take nothing on their defamation claims. We affirm the judgment as modified.

## I. Background

On November 20, 2003, Exxon Mobil Corporation terminated the employment of

* Former Justice Frank C. Price sitting by as- signment.

Dwight Hines and Shannon Everett. At the time of their terminations, Hines was 52 years old and had worked for Exxon Mobil Chemical Company (a division of Exxon) for 23 years. Also at that time, Everett was 50 years old and had worked for the same division for 19 years. The reason Exxon gave Hines and Everett for their terminations was violation of the guidelines governing Exxon's Educational Matching Gift Program. Through this program, Exxon employees and retirees who contribute to colleges and universities may request that Exxon "match" their contributions (not to exceed $5,000) at a ratio of 3 to 1.

In 2002, Exxon undertook a periodic audit of the Matching Gift Program. In the course of their investigation, two internal auditors, David Hintz and Thomas Barnes, became interested in contributions Hines and Everett made to their alma mater Graceland University in Lamoni, Iowa. At the close of their investigation, the auditors concluded that Hines and Everett had contributed to a scholarship fund at Graceland and had applied for Exxon to match those contributions during the same period of time in which their children were receiving scholarships from the fund. The auditors further surmised that Hines and Everett knowingly participated in a scheme designed to obtain a benefit for their children in violation of Matching Gift Program guidelines, which preclude members of the employees' families from benefitting from the charitable contributions and matching funds.

In July 2003, the auditors presented their findings to the supervisors of Hines and Everett and those of other employees who had been identified through the audit as having made suspect contributions. Subsequently, Charlie Jones, a human resources manager, was assigned to review the findings and recommend discipline. In August 2003, Jones gave his recommendations to the employees' managers. Then, on September 23, 2003, he presented the recommendations by way of a conference call to the division vice presidents responsible for certain of the employees in question. Participating in this meeting were Jones, Bruce Macklin (vice president for chemicals), Don Daigle (vice president for refining and supply), Nate Jenkins (a controller in chemicals, who, according to Jones, helped the auditors with the investigation), and Jack Clark (Jones's supervisor in the human resources department).[1]

---

1. Appellees assert that neither Daigle, Jenkins, nor Clark had any responsibility regarding the investigation of appellees or their eventual discipline. While appellees make a valid point regarding Daigle, their assertions regarding Jenkins and Clark are supported by misleading quotations from Jones's trial testimony. This includes quotation of a question asked by appellees' trial counsel as opposed to Jones's actual testimony, which was to some degree at odds with the question. As noted above, Jones testified that Jenkins aided the audit department with their investigation; Jones further testified that Jenkins made a subsequent presentation on the matter to Daniel Sanders, President of Exxon Mobil Chemical Company. Regarding Clark, Jones testified that as his boss, Clark "had to agree to my recommendation" and "would take responsibility for that." Jones further defended Daigle's participation in the meeting on the grounds of promoting consistency and fairness in discipline across the corporation.

Appellees additionally assert that the PowerPoint presentation prepared for the September 23 teleconference was subsequently sent by email to at least five additional people within the company. Plaintiff's Exhibit 93 contains two emails, one by Jones and one by Clark, transmitting an attached document entitled "Educational Matching Gift Case" to participants in the September 23 meeting as well as five other recipients within Exxon. Again, Jones defended the participation of others within Exxon on the grounds of promoting consistency and fairness in discipline across the corporation.

During this meeting, Jones specifically accused Hines and Everett of participating in an "elaborate funding scheme" with "intent to defraud" the Matching Gift Program.

Subsequently, on October 23, Jenkins gave a substantially similar presentation to Daniel Sanders, President of Exxon Mobil Chemical Company, who then approved Jones's recommendation that Hines' and Everett's employment be terminated. On November 20, 2003, Hines' and Everett's employment was terminated. On December 1, 2003, Exxon sent a letter addressed to all current employees and retirees who had previously applied for matching funds for contributions to Graceland, informing them that Graceland was no longer eligible to receive matching funds as a result of an audit of such contributions. The letter further stated that "[a]buses of the program by a few individuals and institutions jeopardize its continuation.... [D]ecisions to rescind an institution's eligibility ... are made to preserve the integrity of the program."

Hines and Everett sued Exxon alleging defamation and age discrimination. As will be discussed in greater detail below, Hines and Everett asserted that various statements made by Exxon representatives were defamatory and compensable. They further alleged that Exxon's stated reason for the dismissals, *i.e.*, violation of the Gift Matching Program guidelines, was a mere pretext for age discrimination.

Prior to trial, Exxon filed a partial motion for summary judgment asserting principally that appellees/cross-appellants could not provide legally sufficient evidence that the stated reason for the terminations was pretextual. The trial court granted the motion against appellees/cross-appellants' age discrimination claims.

The defamation claims proceeded to trial. After both sides closed, the trial court submitted a jury charge asking whether eleven particular statements or sets of statements were defamatory towards Hines and whether twelve particular statements or sets of statements were defamatory towards Everett. The jury found that four sets of statements were defamatory against both, including statements contained in: (1) an "Issues and Findings" document prepared by the auditors; (2) Jones' September 23 presentation to the division vice presidents, (3) the October 23 presentation to the president of Exxon Chemical, and (4) the December 1 letter to employees and retirees who had contributed to Graceland. In regards to Everett, statements in an additional document, identified in the charge only as "[t]he November 19, 2003 document," were also found to be defamatory. The jury further found that Exxon communicated the September 23 and October 23 presentation statements to people "other than those persons having an interest or duty in the matter to which the statement related." However, the jury concluded that Exxon did not communicate the Issues and Findings document, the December 1 letter, or the November 19 document to anyone "other than those having an interest or duty in the matter."

In answer to the damages submissions, the jury found that Hines suffered $100,000 in past mental anguish, $100,000 in injury to character and reputation, and $100,000 in past and future lost income and lost unemployment benefits. It further found that Everett suffered $75,000 in past mental anguish, $75,000 in injury to character and reputation, and $100,000 in past and future lost income and lost unemployment benefits. Lastly, the jury found that Exxon was responsible for 85% of the damages awarded, and Hines and Everett were each responsible for 15% of their own damages. Based on the verdict, the trial court awarded Hines $255,000 and Everett

$212,500 plus pre- and post-judgment interest. As stated, both sides appeal. Exxon attacks the defamation judgment; Hines and Everett challenge the summary judgment against their discrimination claims.

## II. The Defamation Claims

In its appeal, Exxon contends that (1) as a matter of law, the allegedly defamatory statements were protected under the qualified privilege for investigations of employee wrongdoing and were not excessively published; (2) the Texas employment at-will doctrine bars appellees' claims; (3) the employment at-will doctrine, at a minimum, prevents appellees from recovering economic damages under the facts of this case; (4) the evidence is legally insufficient to support the award of noneconomic damages; and in the alternative, (5) the trial court erred in its submission of the excessive publication issue to the jury. Appellees dispute Exxon's contentions and further assert that even if the September 23 and October 23 presentations were privileged as a matter of law, the defamation judgment is still supported by Exxon's publication of the December 1 letter to employees and retirees.

### A. Damages Issues

We turn first to Exxon's challenges to the jury's damages award. Defamatory statements can be categorized as either *per quod* or *per se*. *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex.App.-Austin 2007, pet. denied). Statements that are defamatory *per quod* are actionable only upon allegation and proof of damages; thus, before a plaintiff can recover for defamation *per quod*, he or she must carry the burden of proof on both the existence and amount of damages. *Id.* (citing *Time, Inc. v. Firestone*, 424 U.S. 448, 459, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), and *Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex.1984)); *see also* Black's Law Dictionary 525 (2d Pocket ed.2001). In cases involving defamation *per se*, however, damages are presumed to flow from the nature of the defamation itself; thus, such an action can be sustained even without specific proof of the existence and amount of harm. *See Tex. Disposal*, 219 S.W.3d at 580–81 (citing *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex.2002), and *Knox v. Taylor*, 992 S.W.2d 40, 50 (Tex.App.-Houston [14th Dist.] 1999, no pet.)); *see also* Black's Law Dictionary 525.

Here, the trial court clearly charged the jury on defamation *per quod*. The damages instructions and questions in the charge make no mention of damages being *presumed*, but instead asked the jury to determine the amount of damages "if any." Appellees did not argue in the trial court and do not argue on appeal that their claims were defamation *per se* as opposed to *per quod*. Consequently, appellees had the burden of proving both the existence and amount of damages in order to maintain their defamation causes of action.

Actual damages in defamation actions fall into two categories: (1) those damages termed "economic," "special," or "out-of-pocket," such as, in this case, lost income and lost employment benefits; and (2) those termed "noneconomic" or "general," such as, in this case, mental anguish and injury to character or reputation. *See* Tex. Civ. Prac. & Rem.Code § 41.001(4) (defining "economic damages"), § 41.001(12) (defining "noneconomic damages"); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (explaining that defamation damages are not confined to "out-of-pocket loss"); *Morrill v. Cisek*, 226 S.W.3d 545, 550–51 & n. 3–4 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) (discussing "special" and "general" defamation damages). In its third and fourth issues, Exxon con-

tends that (1) the economic damages awarded by the jury are barred by application of the employment at-will doctrine, and (2) the award of noneconomic damages is not supported by legally sufficient evidence in the record. Both contentions are essentially legal sufficiency or as-a-matter-of-law issues.

■ We must sustain a legal sufficiency challenge if the record demonstrates that: (1) there is a complete absence of evidence on a vital fact; (2) rules of law or evidence prevent the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). We consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. *Id.* at 822. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See id.*

As discussed above, the jury awarded both economic and noneconomic damages to each of the appellees based on publication of the September 23 and October 23 presentations. Consequently, we consider in turn whether the evidence was legally sufficient to support the finding of economic and non-economic damages as related to publication of these two presentations.[2]

## 1. Economic Damages and the At–Will Employment Doctrine

In its third issue, Exxon contends that the economic damages awarded for lost income and lost employment benefits are barred by application of the employment-at-will doctrine. In response, appellees argue that: (1) the doctrine does not in fact bar defamation damages just because the defamatory statements resulted in termination, and (2) the jury must have considered how much of the economic damages were due to the termination versus how much were due to the defamation because the jury awarded less in economic damages than appellees' experts testified to at trial. The arguments under this issue therefore break down into two groups: (1) those involving the legal question of whether the at-will doctrine bars the defamation recovery, and (2) those involving the factual question of whether there is any evidence of defamation damages separate and apart from the damages for termination.

### a. Application of the At–Will Employment Doctrine

■ Under the at-will employment doctrine, an employer may generally terminate an at-will employee without fear of legal repercussions for a good reason, a bad reason, or no reason at all. *County of Dallas v. Wiland,* 216 S.W.3d 344, 347 (Tex.2007); *Montgomery County Hosp. Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex.

**2.** We note at the outset that in the charge, the court authorized the jury to award damages "if any, that resulted from such statements." Thus, the court did not limit damages to those caused by *excessive publication* of the statements. While Texas law has surprisingly little to offer on this topic, the court's charge clearly runs counter to the Restatement in this regard. *See* Restatement (Second) of Torts § 599, cmt. b ("The effect of abuse of a

conditional privilege is to make the publisher of the defamation subject to liability for the abuse. If the harm done by the abuse is severable, and can be distinguished from the harm done by a part of the publisher's conduct that would properly be privileged, he is subject to liability only for the excess of harm resulting from his abuse."). Nevertheless, neither party raises any issues related to this aspect of the charge.

1998).[3] Additionally, as a corollary to the doctrine, Texas does not recognize a cause of action for "negligent investigation" in the employment context. *See Tex. Farm Bureau Mut. Ins. Co. v. Sears*, 84 S.W.3d 604, 606 (Tex.2002). Based on these two principles, Exxon argues that appellee's economic damages are barred because they resulted from the employment terminations and not directly from the defamation. Appellees argue that, like design defect and breach of warranty in the products liability context, wrongful termination and defamation in this case are simply alternative causes of action that would result in the same or similar awards of damages.[4] Thus, according to appellees, they may recover fully on the viable claims for defamation, irrespective of any overlap in damages with nonactionable claims for wrongful termination.

■ We begin by noting that appellees do not allege, and there is no evidence to suggest, that Exxon ever communicated the substance of the September 23 and October 23 presentations to anyone outside the company.[5] Consequently, under appellees' theory, the internal communication of the reason for the terminations (*i.e.*, the alleged defamation) enables them to recover the damages *caused by the terminations*. This would clearly violate the at-will employment doctrine—and its general prohibition against wrongful termination claims by at-will employees—by creating liability where at law none may exist (*i.e.*, by allowing monetary recovery when the employer terminates the employee for a "bad reason").[6] *See, e.g., Wiland*, 216 S.W.3d at 347; *Brown*, 965 S.W.2d at 502. We reject appellees' argument and hold that a terminated employee may not recover damages resulting from employment termination simply because the reason for the termination (even if defamatory) may have been internally communicated within the employing company.

Our holding should not be construed as suggesting that an employer can never defame an employee in Texas or that an employee can never recover defamation damages from his or her employer (whether the defamation was communicated only internally or also externally); it merely means that an employee cannot recover as defamation damages those damages *caused by employment termination*. Accordingly, to the extent damages *resulting from termination* were awarded in the judgment, such award is prohibited under Texas law. However, if appellees proved defamation damages other than those caused by their terminations, they may be entitled to recover those sums.

3. Exceptions to the general rule include terminations based on unlawful discrimination and retaliatory terminations violative of the Texas Whistleblower Act. Tex.Gov't Code §§ 554.001–.010 (Texas Whistleblower Act); Tex. Lab.Code §§ 21.051–.556 (Texas Commission on Human Rights Act).

4. Based on their defamation finding, the jury awarded economic damages to appellees for lost income and lost employment benefits suffered in the past and likely to be sustained in the future. As will be discussed in the next section of the opinion, there is no evidence in the record to suggest that these damages were caused by any Exxon conduct other than the termination of appellees.

5. Furthermore, there is no evidence that any Exxon employee who heard or saw the September 23 or October 23 presentations published the substance of the presentations outside the company.

6. Thus, the situation before us is distinctly different from cases wherein a plaintiff alleges two alternative but not legally prohibited causes of action such as design defect and breach of warranty in the products liability context. In that situation, a plaintiff can recover under one cause of action (assuming he or she can muster the requisite proof) without violating a prohibition against the other claim. Here, recovery of lost wages and employment benefits due to termination violates the at-will employment doctrine.

### b. Sufficiency of the Evidence Regarding Distinct Defamation Damages

■ Appellees additionally insist that the record contains evidence of economic damages caused by the defamatory statements separate and apart from the damages resulting from the terminations. Rather than citing to any such evidence, however, appellees point to the fact that the jury awarded a lesser amount for economic damages than appellees' experts described at trial. Appellees' theory is that because the jury awarded less than was described, it must have considered how much of the economic damages were due to the terminations versus how much were due to other factors and awarded only the latter amount.

To begin with, a jury might decide for a variety of legitimate reasons to discount the damages actually awarded relative to the damages testified to by an expert. *See generally McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986); *Prati v. New Prime, Inc.,* 949 S.W.2d 552, 555 (Tex. App.-Amarillo 1997, pet denied). That the jury did so in this case (and speculation about why it might have done so) does not constitute evidence that there were additional economic damages separate and apart from the termination damages. More importantly, appellees cite to no evidence introduced at trial—and our review has revealed no evidence in the record—of economic damages caused by other than appellees' terminations.

In support of their economic damages claims, appellees offered the reports and testimony of two experts: Haran Levy, a certified public accountant who testified and reported regarding the value of lost earnings and benefits, and Robert Cirkiel,

an actuary who testified and reported regarding the value of the Exxon pension and medicare supplement plans. Levy specifically testified that his report covered "lost earnings and certain benefits ... due to the November 23 termination." He did not identify any damages as being caused by anything other than termination.[7] Cirkiel, as stated, testified and reported regarding the pension and medicare supplement plans appellees lost when they were terminated. He did not identify any damages that were not caused by the terminations in either his report or his testimony. Appellees point to no other evidence of economic damages in the record, and we are not aware of any additional evidence. Consequently, the evidence is legally insufficient to sustain the award of economic damages for excessive publication of the September 23 and October 23 presentations.

### 2. Legal Sufficiency of the Evidence to Support Noneconomic Damages

■ In its fourth issue, Exxon contends that the evidence is legally insufficient to sustain the jury's award of noneconomic damages, namely those for mental anguish and injury to character or reputation. Exxon specifically argues that there is only minimal evidence that the noneconomic damages resulted from anything other than the terminations, and no evidence that these damages resulted from statements in the September 23 or October 23 presentations (which appellees apparently were not even aware of until the lawsuit was filed). Appellees maintain that their non-economic damages resulted more from the reasons given for the terminations and the refusal to retract those allegations than from the actual terminations.

---

**7.** Levy testified that he calculated lost earnings and benefits only for Hines because he determined that Everett suffered "no econom-ic damages" of the types he was asked to calculate.

■ Even if appellees' assertion is correct regarding the source of their damages, under the charge as given and as answered by the jury, to be sustainable, the damages must have been caused by statements in the September 23 and October 23 presentations and not simply by the general reasons given for the terminations.[8] As discussed above, in cases involving defamation *per quod*, damages are not presumed to have flowed from the very fact of communication but must be proven to have resulted from the defamatory communication. *See, e.g., Tex. Disposal*, 219 S.W.3d at 580. Also as discussed above, appellees cannot recover for damages to the extent such damages were caused by their terminations.

■ Specifically, in order to sustain a jury award of mental anguish damages in the defamation context, there must be not only evidence of compensable mental anguish but also some evidence justifying the amount awarded. *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex.2002) (citing *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996)). Such evidence must show a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger; it further must directly demonstrate the nature, duration, and severity of the mental anguish, which caused a substantial disruption in the claimant's daily routine. *EMC Mortgage Corp. v. Jones*, No. 05–06–00419–CV, 2007 WL 2447122, at \*10 (Tex.App.-Dallas 2007, no pet.) (citing *Saenz*, 925 S.W.2d at 614, and *Latham v.*

*Castillo*, 972 S.W.2d 66, 70 (Tex.1998)). Similarly, to sustain an award of injury to reputation or character, there must be competent evidence of "actual injury" to the interests involved (assuming malice is not an issue in the case). *See Gertz*, 418 U.S. at 349–50, 94 S.Ct. 2997; Restatement (Second) of Torts § 621, cmt. b; *see also Bentley*, 94 S.W.3d at 619–20 (Baker, J., dissenting) (discussing *Gertz*); *Finklea v. Jacksonville Daily Progress*, 742 S.W.2d 512, 516 (Tex.App.-Tyler 1987, writ dism'd w.o.j.) (same).

Here, the evidence regarding appellees' general, or noneconomic, damages was presented in two basic forms: (1) specific testimony that certain actions or statements caused certain damage (negative emotions, harm to reputation, etc.), and (2) general testimony that each of the appellees felt negative emotions after his termination or felt as if his reputation and character had been sullied by the reasons for the termination. Regarding the first category, appellees cite to no specific testimony wherein a witness stated that either of the appellees was damaged (noneconomically) specifically by statements contained in the two presentations. To the contrary, the specific testimony related to such things as the fact of being terminated, having to move, receipt of the December 1 letter, the reasons given to each of the appellees for being terminated, and telling family, friends, and others why they were terminated.[9] None of this evidence (however negative and justified the resulting emotions and beliefs may have been) re-

---

8. Interestingly, the jury found that the termination letters given to appellees were not defamatory. It should also be noted that any reasons for the terminations told directly to appellees (although they certainly may have caused mental anguish) were not necessarily defamatory, as defamation requires publication to a third party. *See Granada Biosciences, Inc. v. Forbes, Inc.*, 49 S.W.3d 610, 618

(Tex.App.-Houston [14th Dist.] 2001), *rev'd on other grounds*, 124 S.W.3d 167 (Tex.2003).

9. For example, Hines testified that being fired was "devastating" and life changing, and that looking for work and starting over was "horrible." He further said that telling his children that he had been terminated was "just awful ... just horrible," that he found it hard to leave Houston, and that when he saw the

veals a causal connection to the presentations in question. The fact that the evidence identifies other, distinct causes of the harm, prevents this evidence from supporting the conclusion that appellees were noneconomically harmed by publication of the two presentations.

Regarding the second category, the general testimony of negative emotions and character disparagement was also insufficient for several interconnected reasons.[10] First, most importantly and obviously, none of the general testimony was tied specifically to statements in the two presentations; thus, it does not prove that any damage was caused by publication of those statements. Second, although it might be reasonable to assume when specific evidence of damages is intermixed with more general evidence of damages that all of the evidence relates to damage caused by the same source, it is not reasonable to infer that the general testimony in such a situation (as appellees suggest here) relates to a different, unmentioned specific cause. In other words, the mere fact that the general testimony was generalized does not imply that it related to a separate cause from the cause-specific testimony. Third, there is no evidence that appellees even knew about the two presentations during the time frame in which the alleged damages occurred; thus, there can be no inferential causal link.[11] Lastly, when viewed in

---

December 1 letter (sent by Exxon to current and former employees who contributed to Graceland), it was like "being called a liar and cheat all over again." Debra Hines testified that she could tell from her husband's voice that he was devastated at being terminated and he was stunned that Exxon would not have talked to him and investigated the facts. She also said it was hard for him to tell the children.

Everett testified that he was in a state of disbelief and shock when he learned of his termination and that he could not sleep that night. He said that receiving the December 1 letter was "extremely upsetting." Rosemary Everett testified that her husband was devastated when he lost his job for what he felt was unfair reasons and that it was a hardship to move. Additionally, Peter Knorr, Everett's immediate supervisor at Exxon, testified that when he told Everett about the termination, "[t]here was some emotional outburst.... He seemed more angry than shaken." There was also testimony from several witnesses that recipients of the December 1 letter would have known that it referenced appellees.

10. Examples of the more general evidence in the record includes: Hines' testimony that he felt his good name was still tainted and the fact that Exxon had not retracted anything meant he was still being called a cheater; Debra Hines testimony regarding the importance to her husband of having a "good name," that the allegations almost led to depression, and that he was affected by the knowledge that he could not clear his name; Everett's testimony that he had been proud to work for Exxon; and Rosemary Everett's testimony that her husband's "good name was smeared" and that the time after he was terminated was emotionally and financially stressful.

11. As discussed in the background section above, the presentations in question were given to small groups comprised mostly of upper management personnel. Although the evidence suggests the possibility that the PowerPoint file used during the September 23 presentation was subsequently transmitted to five other Exxon employees via email, there is no evidence that either appellee learned of the occurrence or the substance of either presentation.

Appellees additionally speculate that the presentations may have been even more widely distributed based on the fact that in his testimony, Charlie Jones refused to completely rule out the possibility that some of the people to whom he distributed the presentations may have then distributed the presentations to others. However, the absence of evidence that such redistribution did not occur does not constitute evidence that it did occur. Furthermore, Jones and others testified that the documents were handled pursuant to Exxon protocol intended to limit distribution of sensitive materials.

isolation from the specific testimony, the general testimony does not constitute the type of detailed evidence required to support awards of mental anguish or reputation damages in the defamation context. *See Gertz*, 418 U.S. at 349–50, 94 S.Ct. 2997; *EMC Mortgage Corp.*, 2007 WL 2447122, at *10. Based on the foregoing, we find that the evidence is legally insufficient to sustain the award of noneconomic damages for publication of statements in the September 23 and October 23 presentations.

### B. The December 1 Letter

Appellees additionally assert that the trial court's final judgment may rest on Exxon's publication of the December 1 letter to employees and retirees, even if the court finds that the judgment cannot be supported by reliance on the September 23 and October 23 presentations. As mentioned above, the jury found that the December 1 letter was defamatory against both men but that it was not excessively published. Appellees assert that the letter was excessively published as a matter of law; thus, the jury's finding to the contrary should be disregarded.

■■■ The primary difficulty with appellees' position is that even if the letter in question was excessively published as a matter of law, no damages were awarded on this basis. The damages questions in the charge were predicated on positive answers to both the defamation question and the excessive publication question for each particular statement. Since the jury found that the December 1 letter was not excessively published, it clearly did not consider that letter in assessing damages. Appellees moved for judgment on the verdict. The trial court's judgment tracks the jury's damages findings. Consequently, even if appellees are correct that the letter

was excessively published as a matter of law, the judgment did not award any damages based thereon. Because appellees do not raise a cross-point on appeal complaining about the lack of a damages finding, we cannot reverse a judgment on what would be unassigned error. *See Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex.1998); *Chapman v. Olbrich*, 217 S.W.3d 482, 501 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

In summary, all of the amounts awarded as defamation damages by the jury are either barred by application of law or unsupported by more than a scintilla of evidence in the record. Accordingly, we sustain Exxon's third and fourth issues.[12]

### III. The Discrimination Claims

In their pleadings, appellees additionally alleged that Exxon unlawfully terminated their employment on the basis of age. Prior to trial, Exxon filed a motion for summary judgment against these causes of action; the trial court granted the motion and entered a partial summary judgment. In their cross-appeal, appellees challenge the trial court's ruling. The key dispute between the parties is whether appellees presented legally sufficient evidence of pretext in response to the motion for summary judgment.

### A. Shifting Evidentiary Burdens in the Employment Discrimination Context

■■■ The Texas Commission on Human Rights Act (TCHRA) prohibits discrimination against an employee on the basis of age, among other personal characteristics. Tex. Lab.Code Ann. §§ 21.051–.556. The TCHRA is modeled on the Federal Civil Rights Act of 1991 (Title VII); thus, Texas courts follow federal statutes and cases in

---

**12.** Because our holdings on issues three and four are dispositive of Exxon's appeal in its favor, we need not address Exxon's remaining three issues.

applying the statute. *Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 476 (Tex.2001); *Winters v. Chubb & Son, Inc.,* 132 S.W.3d 568, 574 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

■■ Consequently, in analyzing discrimination cases under TCHRA, Texas courts apply the burden-shifting scheme first enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Winters,* 132 S.W.3d at 574; *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (discussing development of burden-shifting scheme). Pursuant to this scheme, the plaintiff is first required to present a prima facie case of discrimination. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097; *Winters,* 132 S.W.3d at 574. Once the plaintiff has successfully demonstrated a prima facie case, the burden shifts to the defendant to produce evidence showing a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097; *Winters,* 132 S.W.3d at 574. If the defendant carries this burden, the plaintiff must then prove, by a preponderance of the evidence, that the defendant's stated reason is merely a pretext for discrimination. *Winters,* 132 S.W.3d at 574. In other words, although "intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Tex. Dept. Of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

### B. The Summary Judgment Proceedings and Proof

The parties do not dispute that appellees presented a prima facie case of age discrimination by demonstrating that: both of them were over 40 when they suffered an adverse employment action, and they were either replaced by a younger worker or a younger employee received different treatment. *See Winters,* 132 S.W.3d at 574. The parties also agree that Exxon presented a legitimate nondiscriminatory reason for the terminations, namely that Hines and Everett had knowingly violated the guidelines of the Matching Gift Program. In its summary judgment, Exxon attacked appellees' evidence on the third rung of the burden-shifting scheme, asserting that Hines and Everett could provide no evidence that Exxon's proffered legitimate, nondiscriminatory reason for the terminations was a mere pretext for age discrimination.

■■ Under the Supreme Court's opinion in *Reeves,* a plaintiff demonstrates pretext by producing evidence that (1) the reason given by the employer was not its true reason for the employment action but rather a pretext for discrimination or (2) the reason given was unworthy of credence. 530 U.S. at 143, 120 S.Ct. 2097; *Russo v. Smith Int'l, Inc.,* 93 S.W.3d 428, 438 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). In the summary judgment context, a plaintiff does not have to prove pretext but must merely establish that a genuine issue of material fact exists to avoid judgment. *Russo,* 93 S.W.3d at 438 (citing *Amburgey v. Corhart Refractories Corp.,* 936 F.2d 805, 813 (5th Cir.1991)). Summary judgment will be improper if the plaintiff makes a prima facie case and produces sufficient evidence for a jury to disbelieve the employer's stated reason for discharge. *See Reeves,* 530 U.S. at 146–48, 120 S.Ct. 2097. On the other hand, an employer is entitled to summary judgment if the plaintiff's proof creates only a weak issue of fact as to whether the employer's reason was untrue, and there was abun-

dant and uncontroverted independent evidence that no discrimination had occurred. *See id.* at 148, 120 S.Ct. 2097; *Winters,* 132 S.W.3d at 576; *Russo,* 93 S.W.3d at 439.

 In their brief, appellees point to certain summary judgment proof as constituting evidence that Exxon's proffered legitimate, nondiscriminatory reason for the terminations was a mere pretext for age discrimination.[13] Although appellees list the proof separately, it is classifiable into four distinct groups:

(1) evidence that appellees were not told that they were under investigation for having violated Matching Gift Program guidelines prior to their being terminated, including statements by appellees to this effect;

(2) evidence that appellees were not accused of doing anything improper other than the violations of the Matching Gift Program guidelines, including the testimony of one of the auditors and of appellees' supervisors;

(3) evidence that what appellees were accused of doing was common practice at Exxon, *i.e.,* for employees to apply for matching funds when they contributed

to a university in the same year that a child of the employee received a scholarship to attend the university, including the testimony of both auditors; and

(4) evidence that personnel higher in the Exxon hierarchy did little if anything to further investigate the allegations against appellees before deciding to terminate them, including the testimony of Jones (the human resources manager assigned to recommend discipline) and of Sanders (the chemical division president), as well as testimony concerning the corporate audit group and division vice presidents.

Regarding the first category of proof—evidence that appellees were not told they were under investigation—appellees offer no explanation as to how this demonstrates that the investigation was somehow a pretext for discrimination.[14] Furthermore, there was summary judgment proof that the auditors interviewed both appellees regarding the audit of the Matching Gift Program; thus, they had some knowledge of the on-going audit. Indeed, in his deposition, excerpts of which appear in the summary judgment record, Sanders testified that appellees received "pretty solid

**13.** In their brief, appellees make no specific arguments regarding the level of proof offered by Exxon that no discrimination had occurred. *See Reeves,* 530 U.S. at 148, 120 S.Ct. 2097; *Winters,* 132 S.W.3d at 576; *Russo,* 93 S.W.3d at 439.

**14.** In support of their assertion, appellees cite *Laxton v. Gap Inc.,* 333 F.3d 572 (5th Cir. 2003), in which, the appellees assert, the Fifth Circuit held: "the fact that the employer never gave the plaintiff a chance to explain her conduct or improve was sufficient to demonstrate pretext." We do not read the opinion so narrowly. In reversing a summary judgment favoring the employer in a sex discrimination case, the Fifth Circuit pointed out that the reasons provided for the termination included demonstrably false allegations in addition to allegations of conduct that was "argu-

ably authorized" by the company. The court further noted that the strength of the employee's prima facie case of sex discrimination (which included evidence of her capabilities for the job as well as evidence of her supervisor's displeasure at her pregnancy) supported the case for pretext, concluding that all of these factors together were sufficient to raise a fact issue. Additionally, *Laxton* is distinguishable from the present case because in *Laxton,* the reasons for termination were primarily that she had made poor management decisions (something that could be improved upon); whereas here, Exxon alleged that appellees knowingly violated company policies and thereby received a personal benefit. The very nature of the allegations are completely different (alleged performance failures versus allegedly scheming against the company's interests).

warning" that they were being accused of wrongdoing because they had (1) signed certain audit-related forms, (2) been interviewed by the auditors, and (3) had attended briefings on codes and standards of business conduct and had previously participated in business practice reviews. Accordingly, under the facts of this case, the failure to inform appellees of specific accusations and give them a chance to rebut the specific accusations is only very weak evidence of pretext.

Concerning the second category—the absence of other wrongdoing—appellees again do not explain how this evidence demonstrates pretext. Exxon has not asserted that appellees were terminated for general wrongdoing; Exxon asserted and asserts that they were terminated for particular violations of the Matching Gift Program guidelines. Therefore, the presence or absence of evidence regarding other wrongdoing is irrelevant.

As to the third category—that appellees were engaged in a common practice within Exxon—the proof that appellees cite does not lend as much support to their argument as they contend. While one of the auditors, Barnes, acknowledged that it was "a very common practice" for employees to apply for matching funds for contributions to a university in the same year that a child of that employee received a scholarship to attend the university, appellees were accused of doing substantially more. Specifically, appellees were accused of knowingly participating in a scheme that resulted in their family members' *directly benefitting* from the Exxon matching funds. Appellees point to no evidence that participation in such a funding scheme was a common practice for Exxon employees or other charitable institutions.

Lastly, regarding the fourth category—evidence that higher-ups did little to further investigate the allegations—appellees again fail to explain how this alleged failure demonstrates pretext. There was significant evidence in the record showing that the auditors' findings were considered by various levels of supervisors. Presentations were given, received, and reviewed. Interaction between the auditors and the supervisors occurred at various stages. Appellees offer no specific argument or evidence regarding why the supervisors should have felt compelled to conduct their own independent investigations. That the supervisors were apparently comfortable with the work done by the auditors is, at best, very weak evidence of pretext.

In summary, appellees' summary judgment arguments and evidence provided, at best, very weak evidence that Exxon's proffered legitimate, nondiscriminatory reason for the terminations was merely a pretext for age discrimination. *See Reeves*, 530 U.S. at 148, 120 S.Ct. 2097; *Winters*, 132 S.W.3d at 576; *Russo*, 93 S.W.3d at 439. Accordingly, we overrule appellees' sole issue on cross appeal.

### III. Conclusion

In conclusion, we hold that the trial court erred in awarding judgment for appellees on their defamation causes of action but properly granted summary judgment against appellees on their age discrimination claims. Accordingly, we modify the trial court's judgment to render judgment that appellees take nothing on their defamation claims. We affirm the judgment as modified.