**Opinion on rehearing issued November 5, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00155-CV

————————————

**DUSTY BEARD, LORENZO ESPINOZA, ALEJANDRO HERNANDEZ, CLEMENT LANCLOS, FRANCISCO PEREZ, JR., ANTHONY REDDICK, AND ALVIN WALKER, SR., Appellants**

**V.**

**JBT AEROTECH SERVICES, Appellee**

---

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-36083**

---

## MEMORANDUM OPINION ON REHEARING

Dusty Beard, Lorenzo Espinoza, Alejandro Hernandez, Clement

Lanclos, Francisco Perez, Jr., Anthony Reddick, and Alvin Walker, Sr.

(crewmembers) sued JBT Aerotech Services (JBT) for race-related employment discrimination and retaliation in violation of the Texas Commission on Human Rights Act (TCHRA). JBT moved for summary judgment on their claims and, without specifying its grounds, the trial court granted summary judgment in favor of JBT. On appeal, the crewmembers contend that the trial court erred in granting summary judgment because the evidence raises fact issues for each element of their claims for discrimination and retaliation. We grant rehearing and withdraw our opinion and judgment dated June 18, 2013. We order this opinion and judgment be issued in its stead; our disposition remains the same. We dismiss the crewmembers' motion for rehearing en banc as moot. Finding no error, we affirm.

## Background

In the fall of 2008, the plaintiff crewmembers worked a Sunday-through-Wednesday night shift (known as the BMU3 shift) at Bush Intercontinental Airport, operating baggage-handling equipment for JBT's Airport Services Division. Their duties included maintenance and repair of the equipment that transports baggage from incoming planes to the baggage bays.

Lanclos served as the lead operations technician of the 10-to-12-member crew. The lead role was not supervisory in nature, but the lead performed more duties than the other operations technicians on the shift. Those duties included distributing work assignments among crew members, accounting for

2

crewmember's whereabouts throughout the shift, and communicating any of the crew's concerns to the shift supervisor. A lead had no input into decisions to hire, fire, evaluate, or discipline other fellow crewmembers.

A lead operations technician from another shift, Edward Garcia, often worked overtime as a regular operations technician on the BMU3 shift. According to the crewmembers, Garcia was hostile and threatening to the BMU3 crewmembers, made lewd and racially offensive comments, and assigned the dirtiest and most difficult jobs to black crewmembers. Espinoza and Hernandez, both Hispanic males, met with Human Resources Manager Kristi Lepage to complain about Garcia's behavior on their shift. Neither Espinoza nor Hernandez complained or mentioned anything about racially offensive behavior or comments. They told Lepage that Garcia was acting as if he were the lead, by assigning the crewmembers tasks that conflicted with Lanclos's assignments; this confused the crew about which job each was to perform. In early 2009, Bag Room Manager Rob Perry addressed this complaint by minimizing the overtime assigned to Garcia on the BMU3 shift. In reference to Hernandez's complaint to LePage, Garcia later threatened that he was going to go to Hernandez's house and "kick his ass."

One night, BMU3 shift supervisor Scott Johnson gave Reddick, an African-American male, a verbal warning for failing to complete an assignment. Reddick had been teamed with another crewmember, Jason Baker, for the assignment.

3

Reddick did not like to work with Baker and felt that Baker failed to shoulder his share of the work. Reddick felt the disciplinary action was unfair because Baker left in the middle of their assignment. Reddick complained to Lepage about the discipline. Reddick testified that he did not know whether Lepage had investigated the complaint or whether Johnson's disciplinary action had anything to do with his race.

Juan Gutierrez, a friend of Garcia's, became supervisor on the BMU3 shift in November 2008, approximately two months before Garcia's overtime on the shift was minimized in response to Espinoza and Hernandez's complaints.. Perez overheard Gutierrez and Garcia talking about wanting to "get rid" of the African-American employees and using derogatory language about them. According to Perez, Gutierrez tried to recruit him, the Caucasian shift employees, and the other Hispanic shift employees to help Gutierrez eliminate the African-American employees on BMU3 shift. When Gutierrez realized that they would not join him, Gutierrez threatened that he would personally "go ahead and try to shoot [them] in the face" or "beat [them] up" if they complained to human resources about Gutierrez's behavior. Perez recalled that Garcia and Gutierrez had one such discussion while a manager was in the room, but could not recall the number of times or provide the dates when he heard them discussing these matters.

In early February 2009, Beard told Gutierrez that a group of employees had concealed a recording device in the drop ceiling above the supervisors' office intending to secretly record their conversations, and that Beard had heard those recordings. Gutierrez informed Lepage and Site Manager Chris Jeardoe about Beard's allegations. Lepage and Jeardoe, in turn, reported this information to senior management. JBT's senior management retained outside counsel and an outside investigator to investigate these allegations.

Outside counsel interviewed the involved JBT airport service employees, including the plaintiff crewmembers, and asked each of the employees to sign an acknowledgment of voluntary participation in the investigation and a confidentiality agreement. As part of its investigation, counsel verified whether each employee had signed the company's ethics policy acknowledgment; if not, they asked the employees to sign that acknowledgement as well. After completing the investigation, outside counsel and its investigator informed JBT management that Beard, Espinoza, Hernandez, Lanclos, Reddick, and Walker were hostile in the interviews, and they had refused to cooperate with the investigation. The individual circumstances relating to each worker are set forth below:

- **Beard**, a white male, claims that his supervisor instructed him to assign African-American crewmembers more difficult jobs and a heavier workload, but he admitted at his deposition that he never complained to JBT management or

5

human resources about the claimed misconduct. When interviewed concerning the recordings, Beard admitted that he knew of the recordings' existence, but he refused to identify the persons who made or kept them. He also refused to sign the confidentiality agreement and ethics policy acknowledgment.

JBT was poised to terminate Beard for his failure to cooperate with the investigation, but in the meantime, it suspended Beard for his failure to provide the company with additional documentation required for the newly-required heightened security clearance from the United States Customs and Border Patrol (USCBP). USCBP had informed companies with staff who worked in secure areas of the airport it required the heightened security clearance for each employee assigned to those areas. At his deposition, Beard acknowledged that he was unable to obtain the USCBP security clearance. When Beard failed to appear for a May 4, 2009 meeting to discuss his failure to provide the necessary documentation, JBT terminated Beard's employment for job abandonment. Beard conceded that he missed the meeting, but contends that he did not do so intentionally. Beard further testified that he never made any complaint to human resources during his employment and that he believed JBT terminated his employment because he would not tell JBT who possessed the recordings.

• **Espinoza**, a Hispanic male, complained about Garcia's behavior on the BMU3 shift, but did not report any discrimination or harassment. With respect to

6

the investigation, Espinoza admitted to the investigators that he had heard rumors about the recordings, but refused to identify the source of the rumors. JBT terminated him for failure to cooperate with the investigation. Espinoza admitted during his deposition that he did not know whether JBT terminated him in retaliation for anything he did; he never made any complaints to JBT management or human resources about any racial discrimination or retaliation.

- **Hernandez,** a Hispanic male, had complained about Garcia's interference on the BMU3 shift, but he admitted that he did not report that Garcia or anyone else had discriminated against him or harassed him or another employee because of race. In connection with the recording investigation, the investigators informed JBT management that Hernandez was not forthcoming during his interview. Hernandez admittedly refused to sign the company's updated ethics policy, which was a condition of continued employment. JBT terminated Hernandez's employment for failure to sign the policy. Hernandez testified at his deposition that he did not know JBT's reason for terminating his employment.

- **Lanclos**, a white male, also was interviewed in connection with the recording investigation. The interviewer reported to JBT that Lanclos refused to identify a person who told him about the recording device, and refused to disclose his full knowledge. JBT terminated him for failure to cooperate with the investigation. At his deposition, Lanclos testified that he believed that he was

7

terminated unfairly, but did not know whether JBT had any retaliatory motive in deciding to terminate his employment. He admitted that he did not believe he was retaliated against during his employment and that he never complained to JBT about any other employee receiving unfair treatment.

• **Reddick**, An African-American male, refused to sign the confidentiality agreement during his interview. JBT terminated him for failure to cooperate with the investigation. Reddick testified at his deposition that he did not know why he was terminated. He admitted that, while having made complaints to JBT about other employees' lack of professionalism, he had never reported any racial discrimination or retaliation.

• **Walker**, an African-American male, told investigators that he knew nothing about the recording situation. Before the investigation was complete, Walker received an oral reprimand for a workplace rule violation for his failure to notify his supervisor that he had not completed an assigned preventative maintenance task. Walker's immediate response to the oral reprimand was to turn in his tools and walk off the job. JBT terminated Walker's employment for job abandonment. At his deposition, Walker disputed JBT's characterization of the incident as job abandonment, but not its description of his behavior. He testified that he does not claim that he was terminated for refusing to participate in discriminatory acts.

• **Perez**, a Hispanic male, cooperated with the investigative interview. However, he contracted a staphylococcus infection in his knee and went on short-term disability leave. Perez's leave expired on June 30, 2009. When JBT did not hear from Perez, it sent him an application for an extended leave and gave until January 4, 2010 to complete and return the application. Perez did not respond, so JBT sent a reminder notice on January 13. Despite the reminder, Perez did not contact JBT or send a completed application for extended leave. As a result, JBT terminated Perez's employment for failure to return from a leave of absence. Perez admitted at his deposition that he had never brought any complaint of racial discrimination to JBT's attention and that his inability to return to work was the true reason for his termination.

## Discussion

### I. *Summary Judgment Standard of Review*

JBT moved for summary judgment on both traditional and no-evidence grounds, and the trial court's order grants summary judgment without specifying any grounds. We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life Accid. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Under the traditional standard for summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant a judgment as a matter of

law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Dorsett*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

Traditional summary judgment is proper only if the movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). The motion must state the specific grounds relied upon for summary judgment. *Id.* A defendant moving for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc.*, 941 S.W.2d at 911.

After adequate time for discovery, a party may move for a no-evidence summary judgment on the ground that no evidence exists to support one or more essential elements of a claim or defense on which the opposing party has the burden of proof. TEX. R. CIV. P. 166a(i). A no-evidence summary judgment motion is essentially a motion for a pretrial directed verdict. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006). Accordingly, we apply the same legal-sufficiency standard of review that we apply when reviewing a directed

10

verdict. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). Under that standard, a no-evidence point will be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *see City of Keller*, 168 S.W.3d at 810. Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact, and the legal effect is that there is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). In other words, we will affirm a no-evidence summary judgment unless we find evidence in the record that would enable reasonable and fair-minded jurors to differ in their conclusions. *See Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller*, 168 S.W.3d at 822).

## II.    *Unlawful Employment Practices*

### A.    *Texas Commission on Human Rights Act*

Chapter 21 of the TCHRA provides that an employer commits an unlawful employment practice if it discharges an employee on the basis of "race, color, disability, religion, sex, national origin, or age . . . ." TEX. LAB. CODE ANN. § 21.051. In reviewing discrimination cases under TCHRA, we apply the burden-

11

shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973); *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 508 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43, 120 S. Ct. 2097 (2000) (discussing development of burden-shifting scheme).

To prevail on a claim under the TCHRA, the plaintiff is first required to present a prima facie case of discrimination. *Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106. This prima facie case requires a showing that the plaintiff: (1) is a member of the statutorily protected class; (2) qualified for his employment position, (3) was terminated by the employer, and (4) was treated less favorably than similarly situated members of the unprotected class. *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008); *see Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106. To support a discrimination claim based on a hostile work environment, the plaintiff must show that: (1) the plaintiff belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known of the harassment, yet failed to take prompt remedial action. *Felton v. Polles*, 315 F.3d 470, 484 (5th Cir. 2002). A plaintiff complaining of harassment by a

12

supervisor need show only the first four elements. *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 353 (5th Cir. 2001).

In addressing retaliation, the TCHRA provides that "[a]n employer . . . commits an unlawful employment practice if the employer . . . retaliates or discriminates against a person who, under this chapter: 1) opposes a discriminatory practice; 2) makes or files a charge; 3) files a complaint; or 4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." TEX. LAB. CODE ANN. § 21.055. To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link exists between the filing of the claim and the termination. *Green v. Lowe's Home Ctrs., Inc.*, 199 S.W.3d 514, 518 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *see Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67–68, 126 S. Ct. 2405, 2414–15 (2006).

### B.    Analysis

#### 1.    Prima facie case

JBT's motion for summary judgment contended that the crewmembers could not establish a prima facie case of racial discrimination or retaliation because they had no evidence of similarly situated JBT employees who were not disciplined or terminated. To prove discrimination based on disparate treatment, "the disciplined and undisciplined employees' misconduct must be of 'comparable seriousness.'"

13

*Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005); *see AutoZone*, 272 S.W.3d at 594. Further, the situations and conduct of the employees in question must be "nearly identical." *Monarrez*, 177 S.W.3d at 917–18; *see also Perez v. Tex. Dep't of Crim. Justice*, 395 F.3d 206, 213 (5th Cir. 2004). "Employees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be 'nearly identical.'" *AutoZone*, 272 S.W.3d at 594 (citing *Monarrez*, 177 S.W.3d at 917).

Reddick and Walker claim that they received more onerous work assignments because of their race, but they did not provide summary-judgment evidence of any specific instances in which their assignments varied from similarly situated employees who were not African-American, nor did they provide evidence showing that those assignments amounted to an adverse employment action cognizable under TCHRA. *See Benningfield v. City of Houston*, 157 F.3d 369, 376–77 (5th Cir. 1998) (complaint of unusually heavy workload was not adverse employment action); *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 539 (S.D. Tex. 1999) (complaints of increased workload and giving credit for work accomplished to others do not support TCHRA claim). As a result, Reddick and Walker failed to raise a fact issue to support a prima facie case of discrimination based on their race.

### 2. *JBT's proffered nondiscriminatory reasons for termination*

14

Perez, Espinoza, Hernandez, Lanclos, and Beard contend that they raised a fact issue concerning whether JBT terminated their employment based on pretext, and that retaliation for opposing their co-workers' discriminatory treatment of Reddick and Walker was the real reason. Even assuming that the crewmembers raised a fact issue for each element of a prima facie case of discrimination or retaliation, JBT met its burden to articulate legitimate nondiscriminatory reasons for the crewmembers' terminations. *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477 (Tex. 2001); *see also Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106 (explaining that employer's burden is one of production, not of persuasion); *Pilditch v. Bd. of Educ.*, 3 F. 3d 1113, 1117 (7th Cir. 1993) ("[T]he employer need not persuade the court that he was actually motivated by the reason he gives and the mere articulation of the reason rebuts the prima facie case and puts the onus back on the plaintiff to prove pretext.").

The crewmembers complain that JBT was mistaken in its assessment of their lack of cooperation during the investigation, alleging that the recordings they sought simply did not exist. But, "[t]he existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991). JBT relied on the outside investigator's reports of its

15

employees' noncooperation in deciding to terminate the employment of Hernandez, Espinoza, Lanclos, and Reddick, as well as their refusal to sign the required paperwork. The crewmembers adduced no evidence that JBT's reliance on the external investigation was a pretext for discrimination in rendering its decisions, or that they lacked a good-faith reason for requiring that the employees sign a confidentiality agreement and re-affirm its ethics policy, given the nature of its investigation and the interest in obtaining full disclosure of the employees' knowledge of what occurred on its premises during work hours.

Beard, Walker, and Perez likewise fail to raise a fact issue concerning JBT's reasons for terminating their jobs. All three failed to comply with JBT's requests either to appear at work or to provide documentation necessary to continue their employment. In response, the employees allege that these reasons were a pretext for discrimination or for retaliation, but absent direct or circumstantial evidence of discrimination or retaliation to support the contention, mere subjective and speculative beliefs of discriminatory or retaliatory mistreatment will not overcome a motion for summary judgment. *See Green*, 199 S.W.3d at 522 (appellant's subjective belief regarding reason for discharge is insufficient to raise fact issue); *Farrington v. Sysco Food Servs., Inc.*, 865 S.W.2d 247, 251 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (stating that subjective beliefs of discrimination alone are insufficient to establish prima facie

16

case).    We hold that the evidence fails to raise a fact issue to challenge JBT's proffered nondiscriminatory reasons for terminating the crewmembers' employment.

### 3. *Hostile work environment*

Reddick and Walker also allege racial discrimination under a hostile work environment theory, arguing that JBT's managers knew of the "racial tension" that existed on their shift, and generally alleging that JBT should have known of the existence of an atmosphere of racially charged language and threats. Reddick testified that he was subjected to racially derogatory name-calling by fellow nonsupervisory employees and he had overheard an employee from another shift use a racial epithet during a conversation with his supervisor. Walker recounted that he had made fun of the size of a co-worker's ears, and the co-worker responded with a comment about black people "being ashy." In their depositions, both admitted that they had no reason to believe, or did not know, whether their perceived unfair treatment occurred because of their race.

In reviewing a hostile work environment claim, we consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance. *City of Houston v. Fletcher*, 166 S.W.3d 479, 489 (Tex. App.—Eastland 2005, pet. denied); *Green*, 1 S.W.3d at 131–32. The crux of our inquiry is whether the cumulative effect of the offensive behavior is so severe or pervasive that it destroys an employee's opportunity to succeed in the workplace. *Wal-Mart*

18

*Stores, Inc.*, 21 S.W.3d at 473. (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998), 118 S. Ct. 2275; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257 (1998); *Oncale*, 523 U.S. 75, 118 S. Ct. 998; Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 114 S. Ct. 367, 370–71 (1993); and *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 64 106 S. Ct. 2399, 2405–06 (1986)).

On rehearing, Reddick and Walker urge the court to consider their co-workers' testimony in addition to their own in evaluating whether they raised a fact issue on their hostile work environment claim. They point to Perez's testimony that Perez overheard Garcia and Gutierrez discuss the African-American employees using derogatory language and their unsuccessful attempt to recruit other shift members to eliminate the African-Americans on their shift. Another African-American crewmember also testified in his deposition that Gutierrez made a racially derogatory comment during a discussion the two had in the break room. Nothing in the record, however, shows that Reddick and Walker were present during any of those discussions or that they personally experienced the frequency or severity of racially-based animus that would satisfy their summary-judgment burden. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (holding that summary judgment on Title VII hostile work environment claim was appropriate where plaintiff had not personally experienced much of the complained-of conduct, and incidents she did experience were neither severe nor

19

pervasive enough to make her working environment hostile or abusive); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.") (internal citations omitted).

The crewmembers concede that they did not make any complaint of racially hostile treatment to management, and they personally did not experience any direct racial hostility from a supervisor or manager. The offensive comments and unfair work assignments that Reddick and Walker experienced were not pervasive, so as to affect "a term, condition, or privilege" of their employment. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 652 (5th Cir. 2012); *see also Fredonia State Bank v. Gen. Am. Life Ins.*, 881 S.W.2d 279, 283 (Tex. 1994); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 872–75 (5th Cir. 1999). As a result, the trial court did not err in granting summary judgment in favor of JBT on Reddick and Walker's hostile environment claim.

## Conclusion

We hold that the trial court properly ruled that the crew members raised no issue of material fact with respect to their employment-related claims. We therefore affirm the summary judgment of the trial court.


Jane Bland
Justice

Panel consists of Justices Jennings, Bland, and Massengale.