**COLLEGE NETWORK, INC.,**
Plaintiff–Appellant

v.

**MOORE EDUCATIONAL PUBLISHERS, INC., doing business as iStudySmart, Defendant–Appellee**

**Debra K. Moore, Intervenor**
**Plaintiff–Appellee.**

No. 09–50596.

United States Court of Appeals,
Fifth Circuit.

May 12, 2010.

Mark L. Walters, James Matthew Dow, Daniel Robinson Scardino, Jackson Walker, L.L.P., Austin, TX, Steven Craig Shockley, Taft, Stettinius & Hollister, L.L.P., Indianapolis, IN, for Plaintiff–Appellant.

Cindy Olson Bourland, Law Firm of Cindy Olson Bourland, P.C., Round Rock, TX, for Defendant–Appellee/Intervenor Plaintiff–Appellee.

Before KING, WIENER, and DENNIS, Circuit Judges.

PER CURIAM: *

The plaintiff-appellant, The College Network (TCN), sued the defendant-appellee, Moore Educational Publishers, Inc. (MEP), under § 43 of the Lanham Act, 15 U.S.C. § 1125. The intervenor plaintiff-appellee, Debra K. Moore, intervened in the suit and, along with MEP, brought claims against TCN for defamation and tortious interference with prospective business relations. The case was submitted to a jury, which denied relief to TCN under the Lanham Act but granted relief to MEP and Moore on their defamation and tortious interference claims. TCN moved for judgment as a matter of law, arguing that the evidence established a Lanham Act violation and that there was insufficient evidence to support the defamation and tortious interference awards. The district court denied the motion; this appeal followed. For the following reasons, we vacate the tortious interference award but otherwise affirm.

---

## I. Background

TCN and MEP (which does business as "iStudySmart") are competitors in the business of publishing and selling study guides to nursing students. Indianapolis-based TCN was founded in 1995 and conducts its business nationwide in seven geographic regions, with about 200 salespeople, or "program advisors." Moore founded Nashville-based MEP in 1986 and has been its president and sole shareholder since then. MEP also sells its study guides nationwide but is a much smaller operation, with only nine employees. Both companies market their products on the internet.

### A. The Defamatory Statements

In July 2006, TCN held a regional sales meeting at a hotel in Houston, Texas. Approximately 30 to 40 salespeople from TCN's South Central Region, TCN's largest sales region, attended. The purpose of the meeting, according to one witness, was to train TCN's regional sales staff on how to close sales by addressing potential customers' objections to buying study guides from TCN. According to several witnesses, TCN's regional director told the sales staff that they did not need to worry about iStudySmart because the company was "out of business" or was "going out of business." The regional director also instructed the staff to repeat these statements to potential customers. The parties refer to these statements as the "Business Statements." MEP and Moore did not learn of the Business Statements until an iStudySmart sales meeting in May 2007.

In October 2006, Shara Wright, a salesperson for TCN, resigned her employment with TCN. Wright later testified that she did so because she felt TCN's business

practices were unethical. Wright then took a job at MEP.

Several of Wright's extended family members also worked at TCN. After Wright resigned, TCN terminated all of her family members except for Glenn Cason, who is Wright's cousin and TCN's vice-president and national sales manager, and who conducted the terminations. One of the terminated family members, Joel Cromer, later testified that Cason explained to him that termination was necessary because Wright, Cromer's sister-in-law, had gone to work for Debra Moore at MEP, and Moore would steal secrets from TCN. Cromer wrote down his recollection of the conversation shortly after it occurred. His notes state: "Glenn said Debra Moore was a thief and has stolen things from The College Network. He also called her dishonest." The parties refer to the statements by Cason as the "Moore Statements." MEP and Moore did not learn of the Moore Statements until the day before Cromer's deposition in connection with this case in December 2007.

### B. The District Court Proceedings

TCN sued MEP in the Western District of Texas on July 19, 2007, alleging trademark infringement under § 43 of the Lanham Act, 15 U.S.C. § 1125.[1] TCN contended that MEP had purchased the phrase "The College Network" from Google and Yahoo as a search-engine keyword to summon MEP's sponsored-link advertising. TCN contended that this was a use of TCN's trademark in commerce that was likely to cause confusion, in violation of the Lanham Act. At trial, MEP stipulated that it had, in fact, purchased "The College Network" from Google and Yahoo as a

---

1. TCN also alleged misappropriation of trade secrets under Texas law, but that claim is not at issue in this appeal.

search-engine keyword but disputed that this violated the Lanham Act. MEP also asserted that it began this practice only after learning "that TCN was doing the same sponsored link advertising using MEP's name." MEP did not, however, urge an unclean hands affirmative defense and does not urge one now.

Moore intervened in the suit on May 20, 2008, bringing claims against TCN for defamation resulting from the Business Statements and the Moore Statements. MEP counterclaimed against TCN the same day, alleging defamation and tortious interference resulting from the Business Statements.[2]

At trial, TCN presented the testimony of an expert witness, Otto Wheeler, who opined that MEP's use of "The College Network" as an internet search term created a likelihood of confusion under the Lanham Act. Wheeler also opined on purported shortcomings in MEP's and Moore's defamation damages model. MEP and Moore presented witnesses and evidence in support of their defamation and tortious interference claims and the resulting damages, including the testimony of an expert witness, David Fuller. The evidence as to damages resulting from the Business Statements included that TCN's publication of the Business Statements in July 2006 correlated with a significant drop in MEP's sales in the third quarter of that year. The evidence as to damages resulting from the Moore Statements included that Moore's reputation suffered.

Both parties moved for judgment as a matter of law at the close of evidence on the counterclaims and before the case was submitted to the jury. The district court denied the motions and sent the case to the jury.

## C. The Jury Verdict

The jury found that "The College Network" was a valid trademark but that MEP did not infringe it by using it as a search-engine keyword to summon MEP's sponsored-link advertising.

The jury concluded that the Business Statements and the Moore Statements were defamatory and were discoverable as of May 2007 and December 2007, respectively. The jury awarded MEP $49,386 for reputation damages; $86,426 for lost profits; $1,600 for tortious interference with prospective contract; and $500,000 in exemplary damages. The jury awarded Moore $150,000 for reputation damages and $250,000 in exemplary damages.

After the verdict was rendered, TCN renewed its motion for judgment as a matter of law and requested, in the alternative, a new trial. The district court denied this motion but did cap MEP's and Moore's exemplary damages in accordance with Texas law. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(b) (Vernon 2009). The court reduced MEP's exemplary damages to $225,438 and Moore's to $200,000 and entered final judgment. This appeal followed.

## II. Standard of Review

This court reviews the district court's denial of a motion for judgment as a matter of law de novo. *Evans v. Ford Motor Co.*, 484 F.3d 329, 334 (5th Cir.2007); *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir.1995) ("On review of the district court's denial of such a motion, the appellate court uses the same standard to review the verdict that the district court used in first passing on the motion.").

Where the case is tried before a jury, a motion for judgment as a matter of law

---

**2.** MEP also alleged business disparagement. The jury ultimately awarded damages as to this claim, but TCN does not contest those damages on appeal.

constitutes a challenge to the legal sufficiency of the evidence supporting the jury's verdict. *Harrington v. Harris,* 118 F.3d 359, 367 (5th Cir.1997). We will uphold the jury's verdict unless "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED.R.CIV.P. 50(a)(1). Motions for judgment as a matter of law should be granted only if:

> the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.... On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied....

*Brown v. Bryan County,* 219 F.3d 450, 456 (5th Cir.2000) (quoting *Boeing v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc)). Further,

> [a] jury may draw reasonable inferences from the evidence, and those inferences may constitute sufficient proof to support a verdict. On appeal we are bound to view the evidence and all reasonable inferences in the light most favorable to the jury's determination. Even though we might have reached a different conclusion if we had been the trier of fact, we are not free to reweigh the evidence or to re-evaluate credibility of witnesses. We must not substitute for the jury's reasonable factual inferences other inferences that we may regard as more reasonable.

*Hiltgen,* 47 F.3d at 700 (quoting *Rideau v. Parkem Indus. Servs., Inc.,* 917 F.2d 892, 897 (5th Cir.1990)).

Our standard of review for a district court's denial of a motion for new trial is more deferential than a review of a denial for judgment as a matter of law. *Hidden Oaks Ltd. v. City of Austin,* 138 F.3d 1036, 1049 (5th Cir.1998). A district court's denial of a motion for new trial is reviewed for abuse of discretion. *Id.* The "denial [of a motion for new trial] will be affirmed unless there is a clear showing of an absolute absence of evidence to support the jury's verdict." *Whitehead v. Food Max of Miss., Inc.,* 163 F.3d 265, 269 (5th Cir. 1998) ((internal quotation marks omitted)).

## III. Analysis

### A. The Judgment in Favor of Moore

The appellees contended at trial that Moore was defamed by, and that she sustained damages resulting from, the Business Statements and the Moore Statements. The jury agreed, awarding $150,000 in damages for reputation harm and $250,000 in exemplary damages (later reduced to $200,000). TCN argues that Moore's claims as to both statements are time-barred and that there was insufficient evidence to support the jury's damage awards. Each of these assertions is examined in turn.

#### 1. Statute of Limitations and the Discovery Rule

■ TCN contends that Moore's defamation claims are time-barred. The Business Statements were published in July 2006, at TCN's regional sales meeting, and the Moore Statements were published in October 2006, when Glenn Cason terminated Joel Cromer. Moore did not file her defamation counterclaims until April 2008. TCN therefore argues that by the time Moore filed suit, the one-year statute of limitations applicable to defamation claims under Texas state law, TEX. CIV. PRAC. & REM.CODE ANN. § 16.002(a), had lapsed. MEP and Moore counter that Moore's claims were saved by Texas's "discovery rule," under which the statute of limita-

tions is tolled when "the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *See S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex.1996).

The jury found that, "in the exercise of reasonable care and diligence," Moore should have discovered the Business Statements in May 2007 and the Moore Statements in December 2007, and not earlier. The district court denied TCN's post-trial motion for judgment as a matter of law as to the statute of limitations issue, concluding that "[v]iewing the trial record in the light most favorable to MEP and Moore ... the jury had a legally sufficient evidentiary basis for their findings and ... the defamation claims are not barred by limitations." The parties agree that Moore did not in fact discover the Business Statements until May 2007, when Wright told her about them in a sales meeting, and did not discover the Moore Statements until December 2007, on the eve of Joel Cromer's deposition.

Under Texas law, the discovery rule applies to toll the statute of limitations where 1) "the nature of the injury incurred is inherently undiscoverable," and 2) "the evidence of injury is objectively verifiable." *S.V.*, 933 S.W.2d at 6 (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex.1996) (internal quotation marks omitted)). TCN contends that Moore cannot satisfy either prong of the test.

### a. Inherently Undiscoverable

TCN first contends that Moore cannot establish that either the Business Statements or the Moore Statements were inherently undiscoverable. In *S.V.*, the Texas Supreme Court explained that to be "inherently undiscoverable":

> an injury need not be absolutely impossible to discover, else suit would never be filed and the question whether to

apply the discovery rule would never arise. Nor does "inherently undiscoverable" mean that a particular plaintiff did not discover his injury within the prescribed period of limitations; discovery of a particular injury is dependent not solely on the nature of the injury but on the circumstances in which it occurred and plaintiff's diligence as well. An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence.

*Id.* at 7 (citing *Computer Assocs.*, 918 S.W.2d at 456). The parties' arguments as to whether the Business Statements and the Moore Statements were "inherently undiscoverable" are discussed below.

### i. The Business Statements

TCN contends, for the first time on appeal, that the Business Statements were not "inherently undiscoverable" because Moore actually discovered them in May 2007, within the one-year statute of limitations from their publication in July 2006. Because TCN did not raise this argument in the district court, it is waived as a basis for appeal. *See Flowers v. S. Regional Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir.2001) ("If a party fails to move for judgment as a matter of law under ... [Rule] 50(a) on an issue at the conclusion of all of the evidence, that party waives ... its right to challenge the sufficiency of the evidence on that issue on appeal."); *Johnson v. Sawyer*, 120 F.3d 1307, 1331 (5th Cir.1997).

### ii. The Moore Statements

TCN contends that the Moore Statements were not "inherently undiscoverable" before December 2007 (when Moore actually discovered them) because, in the exercise of due diligence, she should have discovered the statements when she inter-

viewed Joel Cromer for a job shortly after he was terminated from TCN in October 2006. TCN raised this contention in its motion for judgment as a matter of law, but the district court summarily rejected it. TCN argues on appeal that:

> [h]ad Moore exercised reasonable diligence in her job interview with Cromer . . . [she] would have asked [him] why he was terminated by TCN just days earlier. Any reasonable employer would have done so. And as Glenn Cason explained to Cromer, the reason was that . . . Wright had gone to work for Moore, who was a thief who had stolen from TCN and was dishonest.

Moore counters that "TCN offered no evidence of circumstances that would have put Moore on notice to ask Cromer if he had heard defamatory statements made about her while employed by TCN," and points out that "a person interviewing for a job would not start disparaging former employers due to the negative impression it would create at a job interview."

From these circumstances, the jury could reasonably have inferred that the Business Statements were inherently undiscoverable to the appellees until December 2007. Such inferences "constitute sufficient proof to support a verdict." *Hiltgen,* 47 F.3d at 700.

### b. Objectively Verifiable

TCN also asserts, for the first time on appeal,[3] that the discovery rule does not apply to the Moore Statements and Business Statements because these statements do not satisfy the "objectively verifiable" prong of the test. Because TCN never raised this issue before the district court, it is waived on appeal. *Flowers,* 247 F.3d at 238; *Johnson,* 120 F.3d at 1331.

### 2. Reputation Damages

The jury found, in response to yes or no questions on the verdict form, that the Business Statements and the Moore Statements were both "defamatory in nature" as to Moore and awarded $150,000 in damages for "[l]oss of reputation, standing, or goodwill." The jury also found, in response to a subsequent question, that the Moore Statements, but not the Business Statements, were "defamatory *per se* " as to Moore. The jury did not award any additional damages for this finding.[4]

TCN argued to the district court that there was insufficient evidence in the record to support the conclusion that Moore sustained reputation damage through either the Business Statements or the Moore Statements. The district court denied TCN's motion for judgment as a matter of law on this basis, concluding that "sufficient evidence supports the jury's award of $150,000 to Moore as damages to her reputation."

TCN now argues, for the first time on appeal, that the "necessary conclusion" to be drawn from the jury's damages award

---

**3.** In fact, the district court specifically noted in its order denying TCN's motion for judgment as a matter of law that the issue of objective verifiability was not before it.

**4.** One oddity, which neither of the parties has raised, is that the jury questions as to whether the Statements were "defamatory in nature" or "defamatory *per se* " appear redundant. Under Texas law, there are two types of defamation: defamation *per quod* and defamation *per se.* Defamation *per quod* "require[s] reference to additional facts" to ascertain the defamatory nature of the statement, and requires "proof of actual damages." *Moore v. Waldrop,* 166 S.W.3d 380, 384 & n. 1 (Tex. App.-Waco 2005, no pet.). Defamation *per se,* by contrast, "itself gives rise to a presumption of . . . damages" and requires no independent proof. *Id.* at 384. TCN characterizes the "defamatory in nature" instruction as an instruction as to defamation *per quod.* The district court instructed the jury only as to the meaning of "defamation *per se.*" The district court did not instruct the jury as to the meaning of "defamatory in nature."

to Moore is that the entire $150,000 awarded was "based on the Business Statements [alone]." TCN reasons that because the jury found that only the Moore Statements were defamatory *per se*, but awarded no damages for that claim, the jury must have concluded that the Moore Statements did not cause damage of *any* kind to Moore. TCN argues that the $150,000 award for statements "defamatory by nature" must therefore relate only to damages from the Business Statements, not the Moore Statements. TCN goes on to argue that there was insufficient evidence to support the proposition that Moore was personally harmed by the Business Statements. Because TCN failed to raise these arguments in the district court, they are waived on appeal. *Flowers,* 247 F.3d at 238; *Johnson,* 120 F.3d at 1331.

### B. The Judgment in Favor of MEP

The appellees contended at trial that MEP was defamed by, and sustained damages resulting from, the Business Statements and that the Business Statements tortiously interfered with prospective sales. The jury agreed, awarding $49,386 for reputation damage, $86,426 for lost profits, $1,600 for tortious interference, and $500,000 in exemplary damages (later reduced to $225,438). TCN argues that MEP's claim was time-barred and that there was insufficient evidence to support the jury's damage award. Each contention is discussed below.

#### 1. The Statute of Limitations and the Discovery Rule

TCN argues that MEP's defamation claims as to the Business Statements are time-barred "for the same reasons [as] Moore's claims for defamation based on the Business Statements." We have already concluded that Moore's claims as to the Business Statements are not time-barred. TCN's argument as to MEP fails for the same reasons.

#### 2. Reputation Damages

■ The jury concluded that the Business Statements were "defamatory in nature" as to MEP and awarded MEP $49,386 in reputation damages. TCN argues that we should vacate the damages award because the evidence at trial did not specifically connect the Business Statements with damages to MEP's reputation. TCN raised an objection to MEP's reputation damages in its motion for judgment as a matter of law, but only summarily, stating simply that "TCN is entitled to judgment as a matter of law on MEP's claim for defamation because . . . there was no evidence of special damages . . . [to] MEP's reputation." Because TCN did not raise the particular argument that it now offers as a basis for relief in the district court, it arguably is waived.

Even if TCN's argument is not waived, however, it lacks merit. TCN cites one case in support of its argument: *Exxon Mobil Corp. v. Hines,* 252 S.W.3d 496, 505 (Tex.App.-Houston [14th Dist.] 2008). In *Exxon,* two former employees sued for defamation after their employment was terminated for allegedly defrauding the company's matching gift program. *Id.* at 499. The employees contended that they were defamed by the fact of and the circumstances surrounding their terminations, which included, among other pieces of evidence, two presentations made by the defendant's internal auditors to the company management that detailed the alleged fraud. *Id.* at 500. The jury charge indicated that the jury should award defamation damages for reputation harm *only if* they concluded that the plaintiffs were defamed by and sustained harm *from the presentations,* as opposed to other circumstances surrounding the termination. *Id.* at 505. The jury awarded damages under this charge. *Id.*

The Texas court of appeals vacated the award, observing that "appellees cite to no specific testimony wherein a witness stated that either of the appellees was damaged (noneconomically) specifically by statements contained in the two presentations." *Id.* at 505. "To the contrary, the specific testimony related to" numerous other alleged instances of defamation. *Id.* The court concluded that the plaintiffs had failed to demonstrate "a causal connection [between their damages and] the presentations in question," adding that "it is not reasonable to infer that the general testimony . . . (as appellees suggest here) relates to a different, unmentioned specific cause." *Id.* at 506. "[T]he general testimony d[id] not constitute the type of detailed evidence required to support awards of . . . reputation damages in the defamation context." *Id.* at 507.

Here, in contrast to *Exxon*, the appellees did present specific evidence that linked the Business Statements to harm to MEP's reputation. Moore testified at trial that deposition testimony had revealed instances of customers who had declined to purchase from MEP because of the perception that the company was going out of business. Four witnesses, all sales staff in attendance at that meeting, testified that they had in fact relayed the Business Statements to MEP customers. Shara Wright testified that she relayed the Business Statements to customers on "hundreds" of occasions. The evidence at trial also showed that the timing of the Business Statements correlated with a downward trend in sales at a time when several factors—including an improved sales staff, an important endorsement from an online college, and an economy in which school enrollment was on the rise—should have prompted an increase in sales. TCN argues that *more* specific evidence should be required, but that is not the relevant standard. Because there was evidence at trial that specifically connected the Business Statements—as opposed to other bad acts or statements by TCN—to harm to MEP's reputation, there is no basis to vacate the jury's award. *Brown v. Bryan County,* 219 F.3d at 456.

### 3. Lost Profits

■ TCN also argues that the appellees' damages model was so flawed that we should vacate the jury's award of lost profits.

Fuller, the appellees' damages expert, testified at trial that TCN's publication of the Business Statements in July 2006 correlated with a significant drop in MEP's sales in the third quarter of that year; that MEP's profits continued to decline over the next seven quarters; and that MEP's profits began to rise only after MEP brought a counterclaim for defamation against TCN in May 2008. Moore testified that MEP was puzzled by this decline because several factors during that time—such as an endorsement in late 2006 by Excelsior College, an online provider of nursing degrees; a similar endorsement by the Center for American Nurses in 2007; and a revamped sales staff—should have boosted MEP's profits but did not. Fuller's damages model assumed that, absent the Business Statements, MEP's nationwide revenues for each of the next seven quarters (October 2006 through June 2008) would have remained the same as in the third quarter of 2006 ($199,210). Based on this assumption, Fuller calculated lost profits of $97,342. TCN called its own expert witness, Wheeler, to rebut Fuller's testimony. Wheeler testified that Fuller's damages model was flawed because it failed to account for the fact that MEP's quarterly revenues had been in steady decline even before the Business Statements were published, falling 45% for the fourteen fiscal quarters before July 2006. The jury concluded that the Business Statements were "defamatory in nature" to MEP and awarded $86,426 in lost

profits, less than the $97,342 Fuller proposed.

In moving for judgment as a matter of law, TCN made only a general argument that insufficient evidence supported the jury's verdict. TCN makes a much more specific argument on appeal, contending that the lost profits award should be vacated because Fuller's calculation was based on the erroneous assumption that MEP would otherwise have earned the same profits in the seven quarters following the third quarter of 2006, when the Business Statements were published, despite the fact that MEP's profits had also declined steadily during the fourteen quarters *before* the Business Statements were published. TCN also criticizes Fuller's model because it estimates *national* lost revenues despite the fact that the evidence at trial confirmed only that the Business Statements were published at TCN's *regional* sales meeting.

Because TCN did not raise these specific issues with the appellees' methodology in its motion for judgment as a matter of law, they arguably are waived. But even when addressed on the merits, these issues do not provide a basis for vacating the lost profits award. The Texas Supreme Court has explained that

> [r]ecovery for lost profits does not require that the loss be susceptible to exact calculation. However, the injured party must do more than show that it suffered some lost profits. The loss amount must be shown by competent evidence with reasonable certainty. This is a fact-intensive determination. At a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained.

*Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex.2001) (citations omitted). "Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost." *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). Although "[a] jury may not arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial," it "has the discretion to award damages within the range of evidence presented at trial." *Knox v. Taylor*, 992 S.W.2d 40, 62 (Tex.App.-Houston [14th Dist.] 1999, no pet.). "[T]he jury may consider conflicting expert testimony on a particular issue and, using its judgment as the finder of fact, blend that testimony to arrive at a proper verdict." *Id.* at 63.

Here, the appellees presented objective evidence of past profits and described factors that should have increased those profits during the time after the Business Statements were published. In assessing the strength of this evidence, the jury had the benefit of TCN's cross-examination of Fuller and the testimony of TCN's own expert witness, Wheeler. The jury settled on a lost profits figure lower than that proposed by Fuller, indicating that the jury considered the conflicting expert testimony in arriving at a damages figure. Contrary to TCN's contention, there is sufficient evidence in the record to support the jury's conclusion as to lost profits. *Cf. Am.'s Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 629 (Tex.App.-San Antonio 1996, writ denied) ("Each side questioned certain assumptions made in the other party's damage model. The jury was free to weigh this evidence in light of the various issues raised as to each party's model.... We are not called upon to reweigh the evidence, and we do not find that the evidence supporting the jury's finding is so weak as to make the finding clearly wrong or manifestly unjust. The requirement of 'reasonable certainty' was met....").

### 4. Tortious Interference

■ TCN also challenges the jury's $1,600 verdict for lost profits relating to tortious interference with prospective business relations. TCN argues that MEP "presented no evidence of a reasonable probability that MEP would have completed any sale to a prospective customer but for TCN's publication of the Business Statements." TCN properly raised this issue in its motion for judgment as a matter of law. The district court rejected it, reasoning that "[a]ll that Texas law requires is a reasonable probability that parties would have entered into a contractual relationship."

TCN correctly points out that to establish tortious interference with prospective contract, a plaintiff must show a "reasonable probability" of a contractual relationship that extends beyond "mere negotiations" with a prospective customer. *Milam v. Nat'l Ins. Crime Bureau*, 989 S.W.2d 126, 132 (Tex.App.-San Antonio 1999, no pet.). "[M]ere evidence of a drop in customers is not sufficient evidence" to establish reasonable probability. *SP Midtown, Ltd. v. Urban Storage, L.P.*, No. 14–07–00717–cv, 2008 WL 1991747, at *9 (Tex.App.-Houston [14th Dist.] 2008, pet. denied) (citing *Milam*, 989 S.W.2d at 132).

In response, the appellees argue only that MEP's "prior strong reputation and its professional endorsements created a reasonable probability that MEP would enter into new contracts with customers" and suggest that one may infer tortious interference from the company's falling profits. This evidence is not sufficient to support the tortious interference verdict. *Id.* Accordingly, we vacate the $1,600 tortious interference award.

### C. The Trademark Judgment

TCN argues that it is entitled to judgment as a matter of law that MEP violated § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1), when it purchased the term "The College Network" from Google and Yahoo as a search-engine keyword to summon MEP's sponsored-link advertising. The jury rejected this claim, holding that although "The College Network" was a valid trademark, MEP's use of it did not violate the Lanham Act.

To establish a claim for trademark infringement under the Lanham Act, TCN was required to show that 1) it had a valid trademark; 2) MEP used the mark in commerce without TCN's permission; 3) MEP's use was "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of MEP with TCN; and 4) TCN sustained damage as a result of this confusion. 15 U.S.C. § 1125(a)(1); *see also Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 460 (5th Cir.2003). The jury instructions assumed that the mark had been used in commerce and instructed the jury on the legal standards for determining the validity of the mark and the likelihood of confusion. The jury verdict form asked the jury whether 1) " 'The College Network' [wa]s a valid trademark or name," and if so 2) whether "MEP infringed [it]." The jury answered yes to the first question but no to the second.

TCN moved for judgment as a matter of law on its Lanham Act claim, arguing that the evidence at trial established a likelihood of confusion as a matter of law. MEP argued in response that whether or not likelihood of confusion was established, MEP's use of "The College Network" was not a "use in commerce" under the Lanham Act. This appears to have been the first time in the litigation that either party or the district court questioned whether a use had in fact occurred. The district court nevertheless agreed with the appellees that MEP's use of the mark was not a "use in commerce" and did not reach

TCN's argument as to likelihood of confusion. TCN appeals the district court's ruling as to use and argues that the evidence established likelihood of confusion as a matter of law.

We need not determine the correctness of the district court's conclusion that there was no "use," however, because assuming without deciding that there was, the evidence does not compel a finding of likelihood of confusion under the relevant Fifth Circuit law. The Fifth Circuit sets out a "nonexhaustive" list of factors to consider when determining likelihood of confusion. *See Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir.2009). These factors are:

> (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.

*Id.* "No one factor is dispositive," and "[i]n addition to the listed factors, a court is free to consider other relevant factors in determining whether a likelihood of confusion exists." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir.1998). Likelihood of confusion requires "a probability of confusion," not a mere possibility. *Xtreme Lashes*, 576 F.3d at 226.

TCN's briefing does not argue that the evidence required a finding of likelihood of confusion under the Fifth Circuit test,[5] but instead contends that such a finding is required under a test adopted in the Ninth Circuit for internet advertising cases. Under this test, three of the likelihood-of-confusion factors—similarity of the marks, relatedness of the goods and services, and the parties' simultaneous use of the internet as a marketing channel—are to be weighed most heavily. *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1173 (9th Cir.2007). Under this test, which the Ninth Circuit terms the "controlling troika or internet trinity," if these three factors suggest that confusion is likely, "the other factors must weigh strongly against a likelihood of confusion to avoid the finding of infringement." *Id.* (quoting *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 942 (9th Cir.2002)). But the Fifth Circuit has never adopted this rule, and TCN raised no objection at the charge conference to jury instructions based only on the applicable Fifth Circuit rule. Because TCN did not urge the Ninth Circuit test before the case was sent to the jury, it has waived any argument that the test should be applied. *See Hobbs v. Alcoa, Inc.*, 501 F.3d 395, 397 (5th Cir.2007) (claim that different legal standard should have been applied is waived where party "failed to object to the substance of the jury instructions or the verdict form").

## IV. Conclusion

For the foregoing reasons, we VACATE the $1,600 tortious interference award but otherwise AFFIRM.

---

5. TCN did urge at oral argument that the evidence established likelihood of confusion as a matter of law under the Fifth Circuit test. But arguments not briefed and raised for the first time at oral argument are waived. *N.L.R.B. v. Seaport Printing & Ad Specialties, Inc.*, 589 F.3d 812, 816 (5th Cir.2009). In any event, sufficient evidence supported the jury's finding of no likelihood of confusion under the Fifth Circuit test. MEP and Moore presented extensive documentary evidence on the issue. The jury was permitted to view the keyword-search process and visually compare the companies' websites. TCN's own expert testified as to lack of actual confusion. The evidence does not point so "strongly and overwhelmingly in favor" of TCN that a reasonable jury could not arrive at a contrary verdict. *Brown v. Bryan County*, 219 F.3d at 456.