Reversed and Remanded and Majority and Dissenting Opinions filed July
28, 2011.

 

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00718-CV

___________________

 

Deborah Downing, Appellant

 

V.

 

Don Burns and Sherry Burns,
Appellees



 



 

On
Appeal from the 268th District Court

Fort Bend County,
Texas



Trial Court Cause No. 07-DCV-154732

 



 

 

OPINION

            Before Deborah Downing
resigned from her job as an assistant to realtor Don Burns, she copied several
pages from the office policy and procedures manual she had written for him. 
After they learned of this, Don and his wife Sherry told several people that Downing
stole from them, and that they would sue anyone who employed her if the
material was not returned.  When Downing was fired from her two subsequent jobs,
she sued the Burnses for tortious interference and defamation, and they
countersued for theft of trade secrets.  The jury found in Downing’s favor on
all three claims, but the trial court entered judgment in her favor on only the
tortious-interference and theft claims.  Both sides appealed.

            We conclude that the Burnses
did not defeat Downing’s recovery by conclusively proving their counterclaim
for theft of trade secrets.  Further, the evidence is legally and factually
sufficient to support the jury’s findings that the Burnses are liable to
Downing for defamation and for tortious interference with contract; however, the
record does not support the full amount of damages awarded by the trial court
on Downing’s tortious-interference claim.  Because the tortious-interference
claim is not separable from the defamation and theft claims without unfairness
to the parties, we reverse the judgment and remand the case for a new
trial without addressing the remaining issues.  

I. 
Background

            For nearly two years, Deborah
Downing was employed as Don Burns’s assistant at his real-estate agency.  Just
before Downing resigned in late September 2006, she copied several pages from
the policy and procedures manual she had written for the agency.  

            In October or November of
2006, Downing accepted two part-time jobs as the office manager for realtors
Christine Fuentes and Sima Dalvandi.  Both realtors were affiliated with a
Keller Williams real-estate agency.  Downing worked a total of about thirty
hours per week for Fuentes and Dalvandi, and was paid separately by each. 
Dalvandi paid Downing $17.50 per hour, but Fuentes paid Downing no more than
$12.50 per hour.  

            In mid-November of that year,
the Burnses’ attorney wrote to Downing, alleging that she had copied
confidential, proprietary marketing plans and client care-packages.  The attorney
demanded that Downing return the material and informed her that the Burnses
would sue her if she failed to do so.  Downing responded that she had no such
material, and she identified the four pages of material she had copied from the
policy and procedures manual.  

            Also that autumn, Sherry
learned from her friend Bernadette Hurley that Downing had begun working for
realtors at a Keller Williams real estate agency.  Sherry told Hurley that
Downing had stolen the Burnses’ policy and procedures manual, and by January of
2007, the story had reached Andy St. Jean, another officer manager at the
Keller Williams agency.  St. Jean telephoned Sherry, but was unable to reach
her.  Sherry returned St. Jean’s call and repeated her allegation that Downing
had stolen the Burnses’ policy and procedures manual.  Sherry also asked St.
Jean if Downing, before accepting her current employment, notified others at
the Keller Williams agency that the Burnses’ attorney had demanded that she
return the material.  Sherry told St. Jean that the Burnses’ attorney notified
Downing that if she did not return the materials, the Burnses would sue Downing
and anyone who employed her.[1]  

            Sherry’s statements to St.
Jean were repeated to Fuentes, one of Downing’s employers.  When Fuentes learned
that the Burnses had threatened to sue anyone that employed Downing, Fuentes
fired her.  Fuentes testified that she did not believe the allegations of
theft, but she fired Downing because she could not afford to be sued and “did
not want to be a party to a frivolous lawsuit.”  Dalvandi terminated Downing’s
employment at the same time, but Downing offered no evidence at trial that
Dalvandi was aware of the Burnses’ allegations or their threat of litigation.[2]  Downing remained unemployed until April 2008, when
she began working part-time at a residential facility for people with
Alzheimer’s disease.  

            When Downing was leaving the
Keller Williams agency, she told co-worker Eulalia Castillo of the Burnses’
threats.  As Don’s friend and former employee, Castillo telephoned him about
the allegations against Downing.  Don told Castillo that Downing not only had
taken a copy of his marketing secrets but also had stolen his clients’ option
checks.  Castillo did not believe this and said there had to be some mistake,
but Don ended the conversation.[3]

            The same month that Downing
was terminated, Fuentes and the Burnses attended a meeting of the Houston
Association of Realtors, referred to by the witnesses as HAR.  Fuentes
introduced herself to Don, told him she had heard that the Burnses planned to
sue anyone that hired Downing, and expressed the hope that she was not a party
to any lawsuit.  Don walked away from Fuentes, but sent Sherry to speak to
her.  Fuentes repeated to Sherry that she hoped the Burnses were not planning
to sue her.  Sherry responded by asking if Downing still worked for Fuentes,
and when Fuentes said that Downing did not, Sherry said, “[W]ell, then you
don’t have to worry about being sued.”  Sherry also told Fuentes that Downing
had stolen money or checks from the Burnses.  

            The rumor that Downing had
stolen from the Burnses apparently spread to others in the industry.  At
luncheon meeting of the same professional association,[4] Mary Stuart approached Sherry to discuss Downing.  As
Sherry later testified, Stuart expressed disbelief, but Sherry told her, “yes,
it’s true.”  

            Downing sued the Burnses for
defamation and tortious interference with contract, and the Burnses asserted
the affirmative defenses of justification and qualified privilege and
counterclaimed for theft of trade secrets.[5]  At trial, Downing offered into evidence her own
response to a request for disclosure of the amount of her economic damages,
together with a description of the method used to calculate such damages.  She
concluded that her known economic damages were $57,230.00.  During closing
argument, her attorney told the jury that the damages caused by the Burnses’
defamation were the same as those caused by their tortious interference, and
argued that the jury should answer the damage questions for each by referring
to the calculation in this exhibit.  The trial court refused to submit
questions to the jury about the Burnses’ affirmative defenses of justification
and qualified privilege

            A unanimous jury found that
Downing did not commit theft of trade secrets and that the Burnses tortiously
interfered with Downing’s employment and defamed her.  As compensation, the
jury found that Downing was entitled to recover $100,000.00 from the Burnses—$57,230.00
for tortious interference and $42,770.00 for defamation.  

            The Burnses moved for judgment
notwithstanding the verdict.  As to the claim that they tortiously interfered
with Downing’s employment contract, the Burnses argued that their statements
about Downing were privileged as a matter of law, and in any event, the
evidence did not support the jury’s damages finding on that claim.  The Burnses
argued that Downing could not recover on her defamation claim because
(a) Downing admitted copying and retaining material from the policy and
procedures manual, thereby proving the truth of the Burnses’ allegedly
defamatory statements; (b) there is no medical evidence that Downing
suffered mental anguish; and (c) there is no evidence of any kind that the
Burnses’ statements damaged Downing’s reputation.  In response to Downing’s
motion for verdict on the judgment, the Burnses additionally argued that
Downing could not recover on both her defamation and tortious-interference
claims because such an award would be an impermissible double recovery.  The
trial court granted the Burnses’ motion only as it pertained to the defamation
claim and entered final judgment in Downing’s favor on the
tortious-interference claim, together with interest and costs.  The Burnses
immediately filed for bankruptcy protection, and Downing filed a motion for
relief from the automatic stay.  When the motion was granted, Downing appealed
the trial court’s partial grant of the Burnses’ motion for judgment
notwithstanding the judgment.  After moving unsuccessfully for a new trial on
legal and factual sufficiency grounds, the Burnses appealed the trial court’s
partial denial of their motion for judgment notwithstanding the verdict.   

II. 
Issues Presented

            Downing contends that the trial
court erred in partially granting the Burnses’ motion for judgment
notwithstanding the verdict, and she asks that we render judgment on both her
defamation and tortious-interference claims in the full amount found by the
jury.  The Burnses ask that we render judgment in their favor on their
counterclaim on the ground that they conclusively established that Downing
stole trade secrets from them.  They also argue that the evidence is legally
and factually insufficient to support the jury’s liability and damage findings
on Downing’s tortious-interference claim.  They further assert that the trial
court abused its discretion in failing to submit questions to the jury
concerning their affirmative defenses.  

II. 
Analysis

            Before addressing those issues
that would result only in remand, we must first consider the points on which we
could render judgment.  Lone Star Gas
Co., v. R.R. Comm’n of Tex., 767
S.W.2d 709, 710 (Tex. 1989) (per curiam).  If we accept the Burnses’ argument that
they conclusively proved theft of trade secrets, we could render a take-nothing
judgment on Downing’s tortious-interference claim.  And if the Burnses are
correct in arguing that the record does not support the jury’s
defamation-damages finding, then we could render judgment in their favor on
that claim as well.  We therefore begin our analysis with these issues, each of
which requires us to review the legal sufficiency of the evidence.

            Judgment without or against a
jury verdict is proper only when the law does not permit reasonable jurors to
decide otherwise.  City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005).
 We therefore review judgments notwithstanding the verdict for legal
sufficiency of the evidence supporting the verdict, bearing in mind that it is
the jury’s province to evaluate witness credibility and determine the weight to
attach to testimony.  Envtl. Procedures, Inc. v. Guidry, 282 S.W.3d 602,
626 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (citing City of
Keller, 168 S.W.3d at 819).  We consider the evidence in the light most
favorable to the verdict and indulge every reasonable inference that would
support it, crediting favorable evidence if a reasonable factfinder could and
disregarding contrary evidence unless a reasonable factfinder could not.  See
City of Keller, 168 S.W.3d at 823, 827.  If the evidence viewed in this
light would enable reasonable and fair-minded people to find the challenged
fact, then judgment notwithstanding the verdict is improper.  See id.  Thus,
when the party who bore the burden of proof on an issue attacks the legal
sufficiency of the evidence supporting the jury’s adverse finding, that party
must demonstrate that the evidence conclusively established the opposite of the
jury’s finding.  Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex.
2001) (per curiam). 

A.        Theft of Trade Secrets

            The Burnses argue that the evidence—and in
particular, Downing’s admission that she took copies of several pages of the
policy and procedures manual—conclusively establishes Downing’s liability for
theft.  They therefore contend that the trial court erred in failing to grant
their motion for judgment notwithstanding the verdict on this basis.  We
disagree.

            The jury charge regarding the Burnses’
theft counterclaim contained the following instruction:

“Theft” is defined as unlawfully appropriating property
that is a trade secret.  A person commits theft if without the owner’s consent,
he knowingly: (1) steals a trade secret or (2) communicates or transmits a
trade secret.  “Trade secret” means the whole or any part of any scientific or
technical information, design, process, procedure, formula, or improvement that
has value and the owner has taken measures to prevent from becoming available
to persons other than those selected by the owner to have access for limited
purposes. 

            By this instruction, the trial
court charged the jury to determine Downing’s liability under the Texas Theft
Liability Act, which pertains only to theft of trade secrets.  See Tex. Civ. Prac. & Rem. Code
§ 134.001 et seq. (West 2011).  To be a trade secret, “the
information, design, process, formula or improvement must not only be a secret,
but must also be generally unavailable to the public and it must give one who
uses it an advantage over competitors that do not know of or use the trade
secret.”  See McGowan v. State, 938 S.W.2d 732, 738 (Tex. App.—Houston
[14th Dist.] 1996), aff’d sub nom. Weightman v. State, 975 S.W.2d 621
(Tex. Crim. App. 1998) (en banc).  When determining whether information
constitutes a trade secret, courts consider factors such as (1) the extent to
which the information is known outside of the owner’s business; (2) the
extent to which it is known by employees and others involved in the owner’s
business; (3) the extent of the measures taken to guard the information’s
secrecy; (4) the information’s value to the owner and his competitors;
(5) the amount of effort or money the owner expended to develop the
information; (6) the ease or difficulty with which the information could be
properly acquired or duplicated by others.  In re Bass, 113 S.W.3d 735,
739 (Tex. 2003) (citing Restatement of
Torts § 757 cmt. B (1939) and Restatement
(Third) of Unfair Competition § 39 cmt. d (1995)).

            On this record, a reasonable
jury could find that Downing retained copies of only four pages from the
manual, and that these pages contained no trade secrets.  One of these
pages contains instructions for adding a picture to an email template and
saving the template.  One page contains instructions for purchasing postage
online from the United States Postal Service, together with Don’s password for
that website.  The remaining two pages contain step-by-step instructions for
accessing the website of the Houston Association of Realtors and the website of
a company identified as Centralized Showing Service, together with Don’s
password for each of these sites.  

            Turning first to the
information other than Don’s passwords, the Burnses did not establish that the
steps to access these websites or to attach a template to an email were
secret.  Sherry considered the policy and procedures manual as a whole to be
confidential, but of these four pages, Sherry identified only the passwords as
confidential.  Downing testified that the Burnses never told her the manual was
confidential; the material is not marked as confidential; and she was not asked
to sign any confidentiality agreements.  Castillo, who was formerly employed by
the Burnses and was familiar with the policy and procedures manual, testified
that it contained no confidential information and that the Burnses took no
steps to protect the material.  Both Downing and Castillo testified that the
information in the manual was generally known in the industry.  Such information
is not eligible for trade-secret protection.  See Gonzales v. Zamora,
791 S.W.2d 258, 264 (Tex. App.—Corpus Christi 1990, no writ).  

            As for Don’s passwords, the
record shows that all of Don’s employees had access to them.  Some of the
employees took the manual home, and some even had copies of it on their
personal computers.  The jury heard evidence that a couple of days after
Downing resigned, the Burnses changed the passwords when another of Don’s
employees told the Burnses that Downing had copied the policy and procedures
manual.  The Burnses offered no evidence of the time, effort, or cost expended
in developing the passwords, and no evidence that a competitor who possessed
copies of the passwords Don used to access these websites in September 2006
would have an advantage over someone who did not have that information.  

            The Burnses also contend that
“because the trial court had ruled that the pages contained trade secrets, the
theft of a trade secret was established as a matter of law.”  In support of
this argument, the Burnses cite to the trial court’s statements in the record
expressing the view that passwords are trade secrets or protected information. 
These statements explain two of the the trial court’s rulings, but are not
themselves rulings or findings to be considered by this court.  This is
apparent when the statements are considered in context.  Downing moved for a
directed verdict on the ground that there was no evidence to support the claim
that she had stolen trade secrets, and the trial court denied the motion,
stating, “Certainly in this day and age passwords are protected information. 
The court recognizes that as such and considers that to be a trade secret, so
your motion as to that part of it is denied.” (emphasis added).  Downing
then objected on no-evidence grounds to submission of a theft question to the
jury, and the trial court overruled that objection for the same reason.  The
Burnses, however, did not move for a directed verdict on their theft
counterclaim.  Moreover, the trial court did not grant a partial directed
verdict sua sponte, but included the Burnses’ theft issue in the jury charge
without objection from the Burnses.  Thus, despite these isolated statements on
the record, the trial court treated the question of whether Downing knowingly
stole trade secrets as a question of fact to be decided by the jury.[6]

            In sum, the Burnses did not
conclusively prove that Downing knowingly stole  trade secrets.  We therefore
conclude that the trial court did not err in denying their request for judgment
notwithstanding the verdict as to that claim.  

B.        Defamation 

            A trial court may grant a motion for
judgment notwithstanding the verdict if no evidence supports the findings on
which the jury relied.  Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co. of
Pittsburgh, Pa., 77 S.W.3d 253, 268 (Tex. 2002).  We review such a
judgment by viewing all the evidence in the light most favorable to the jury’s
finding, and reverse if more than a scintilla of competent evidence supports
the finding.  Id.  

            The dispositive arguments on
this issue turn on the distinction between statements that are defamatory per
quod and those that are defamatory per se.  See Exxon Mobil Corp. v.
Hines, 252 S.W.3d 496, 501 (Tex. App.—Houston [14th Dist.] 2008, pet.
denied).  To recover for defamation per quod, a plaintiff must prove both
the existence and amount of damages.  Id.  But in cases involving
defamation per se, “damages are presumed to flow from the nature of the
defamation itself; thus, such an action can be sustained even without specific
proof of the existence and amount of harm.”  Id.  

            An oral statement is defamatory per se only if it
falls within one of the following categories: (1) imputation of a crime;
(2) imputation of a loathsome disease; (3) injury to a person’s
office, business, profession, or calling; or (4) imputation of sexual
misconduct.  Gray v. HEB Food Store No. 4, 841 S.W.2d 327, 329 (Tex.
App.—Corpus Christi 1997, writ denied).  If the jury finds that the
defendant made the allegedly defamatory statement about the plaintiff, and the
statement is defamatory per se, then the factfinder may presume that the
statement injured the plaintiff’s reputation.  Bentley v. Bunton, 94
S.W.3d 561, 604 (Tex. 2002).  When the presumption applies, the plaintiff is
entitled to recover general damages, such as for loss of reputation and mental
anguish.  Id.  At a minimum, the plaintiff in such a case is entitled to
nominal damages.  Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings,
Inc., 219 S.W.3d 563, 581 (Tex. App.—Austin 2007, pet. denied) (citing Bentley,
94 S.W.3d at 604).  If the statement is only defamatory per quod, then
the plaintiff must prove the existence and amount of damages.  Id. at
580.

            Downing contends that because
Don’s statement to Castillo that Downing stole clients’ option checks is
defamatory per se, legally sufficient evidence supports the jury’s liability
finding, and thus, the trial court erred in granting the Burnses’ motion for
judgment notwithstanding the verdict as to her defamation claim.  We agree.  

            The Burnses’ statements that
Downing stole from them and from their clients fall within the categories of
statements that are defamatory per se.  See Gray, 841 S.W.2d at 329
(imputation of a crime is defamatory per se); see also Bradbury v. Scott,
788 S.W.2d 31, 38 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (a
statement that an employee was dishonest in his dealings with his employer is
defamatory per se because it falls within the general classification of “words
that affect a person injuriously in his profession or occupation”).  And
because the statements are defamatory per se, general damages are presumed.  See
Leyendecker & Assocs., Inc.v . Wechter, 683 S.W.2d 369, 374 (Tex. 1984)
(op. on reh’g) (“The law presumes a statement which is libelous per se defames
a person and injures his reputation.”);[7] see also Bentley, 94 S.W.3d at 587 (defining
“defamatory” as “injurious to reputation.”).  The Burnses therefore are liable
to Downing for general damages, even in the absence of any evidence of harm.  The
amount to award for harm to the plaintiff’s reputation lies within the jury’s
discretion.  Bolling v. Baker, 671 S.W.2d 559, 570 (Tex. App.—San
Antonio 1984, writ dism’d w.o.j.).  At a minimum, the plaintiff is entitled to
a nominal sum, but is not limited to that amount, and the jury may choose to
award damages that are “substantial.”  W. Tex. Utils. Co. v. Wills, 164
S.W.2d 405, 408 (Tex. Civ. App.—Austin 1942, no writ).

            The Burnses argue that Downing cannot recover for defamation per se because in
her pleadings she alleged only “defamation”; however, they cite no authority in
support of this contention.  But see, e.g., Bentley, 94
S.W.3d at 576, 582 (plaintiff asserted claim for defamation; trial court did
not err in granting motion for directed verdict in that the statements were
defamatory per se);[8]
Salinas v. Townsend, No. 13-09-00421-CV, 2011 WL 61844, at *4, *9 (Tex.
App.—Corpus Christi Jan. 9, 2011, no pet. h.) (plaintiff alleged defamation;
court affirmed trial court’s conclusion that the statement was defamatory as a
matter of law).  A statement that defames a private individual necessarily is
either defamatory per se or defamatory per quod, and the term
“defamation” does not imply defamation per quod any more than it implies
defamation per se.  In most cases, the question of whether a statement is
defamatory per se or defamatory per quod is instead a matter of law to
be decided by the court.  Terry v. Schiro, No. 01-07-00060-CV, 2007 WL
2132461, at *3 n.3 (Tex. App.—Houston [1st Dist.] July 26, 2007, pet. denied)
(mem. op.).  Moreover, defamation per se and defamation per quod are not
separate causes of action; the distinction between them instead “‘is based on a
rule of evidence, the difference between them lying in the proof of the
resulting injury.’”  Goree v. Carnes, 625 S.W.2d 380, 384 (Tex. App.—San
Antonio 1981, no writ) (quoting 36 Tex.
Jur. 2d Libel and Slander § 2).  

            The Burnses additionally argue that Downing cannot recover
for defamation per se because the jury was charged only with defamation per
quod.  In support of this argument, they cite Hines, in which we
held that the trial court charged the jury only on defamation per quod,
and we did not apply the damage presumption applicable to defamation per
se.  Here, as in Hines, the defamation-damage question in the charge did
not include an instruction that damages were presumed.  Id. at 501. 
Unlike the case before us, however, the plaintiff in Hines never argued
that the presumption of general damages from defamation per se applied.  See
id.  Further, the plaintiff in Hines also requested and received
economic damages for the defamation claim, and economic damages are not general
damages which can be presumed to flow from defamation per se.  Compare id. at
501–02 with 28 Tex. Jur. 3d
Damages ' 161 (West
2011) (explaining that defamation per se implies
general damages, not special damages).  In contrast, the trial court did
not instruct the jury in this case to consider or award economic damages for
defamation.[9] 
Because the trial court did not charge the jury to determine Downing’s economic
damages from defamation,[10]
the jury’s answers do not show that Downing—unlike Hines—was awarded damages
that could not have been presumed.  We therefore conclude that the trial court
erred in granting the Burnses’ motion for judgment notwithstanding the verdict
with regard to the defamation claim. 

C.        Tortious-Interference
Liability

            The Burnses
offer two reasons for their assertion that the evidence is legally insufficient
to support the finding that they tortiously interfered with Downing’s
employment.  First, they point to evidence that Sherry telephoned Andy St. Jean
only after St. Jean left a message asking Sherry to call, and that Sherry’s
statements to St. Jean were made in answer to St. Jean’s questions.  But the
Burnses cite no authority that such evidence is inconsistent with liability for
tortious interference.  This argument therefore is waived.  See Tex. R. App. P. 38.1(i).   

            Citing Sterner v. Marathon Oil Co.,
767 S.W.2d 686 (Tex. 1989), they next state that the evidence of liability is
legally insufficient because they did not “direct” Downing’s subsequent
employers to fire her.  Their reliance on Sterner is misplaced.  In that
case, the defendant did not challenge the legal sufficiency of the evidence
supporting the tortious-interference claim, see id. at 688, but argued
that its interference was justified because it did so in the bona fide exercise
of its own rights.  Id. at 691.  The court held that the defendant did
not conclusively establish its affirmative defense because there was evidence
that the defendant premises owner directed the plaintiff’s employer, an
independent contractor working on the premises, to fire the plaintiff.  Id. 
Although the court held that such evidence prevented the defendant from
conclusively proving its affirmative defense, it did not hold that such
“direction” is an element of the tortious-interference cause of action.  See
id.

            Here, Sherry admits she told St. Jean
that if Downing did not return the allegedly stolen policy and procedures
manual, then the Burnses would sue anyone that employed her.  Fuentes testified
without contradiction that she fired Downing only to avoid this threatened
litigation, and Downing presented evidence that the termination harmed her
financially.  Because we conclude that this evidence is legally sufficient to
support the jury’s liability finding, we hold that the trial court did not err
in denying this portion of the Burnses’ motion for judgment notwithstanding the
verdict.  See Butnaru v. Ford Motor Co., 84 S.W.3d 198, 207 (Tex. 2002)
(explaining that a successful claim of tortious interference with an existing
contract requires proof that the defendant willfully and intentionally
interfered with an existing contract, proximately causing the plaintiff actual
damage or loss).  

D.        Tortious-Interference
Damages 

            In closing argument, Downing’s attorney
urged the jury to find that the Burnses’ tortious interference with Downing’s
subsequent employment cost her $57,230.00 in lost wages.  In support of that
argument, Downing’s counsel relied on an exhibit consisting of Downing’s answer
to a request for disclosure concerning her damages.  The exhibit is based on
the erroneous assumption that Downing was working 40 hours per week at a rate
of $17.50 per hour before the Burnses’ tortious interference.  In the exhibit,
Downing described her damage model, beginning with the representation that she
“made $17.50/hr @ Keller Williams equaling to $700.00/week, $3,010.00/month and
$36,120.00/yr.”[11]  The rate of $3,010.00 per month was then multiplied
by 23, said to be the “number of months since Plaintiff’s employment ended with
Keller Williams,” to arrive at the figure of $69,230.00.  From that amount,
Downing deducted $3,500.00 she received in unemployment benefits and $8,500.00
she earned from subsequent employment, arriving at a total of $57,230.00—the
very figure awarded by the jury on her tortious-interference claim.  

            But the record does not
support the full amount of these damages.  Downing testified that she was
working only about 30 hours per week.  And although she presented evidence that
Fuentes fired her due to the Burnses’ tortious interference, Fuentes was only
one of Downing’s two employers.  Downing also worked for Sima Dalvandi.  Both
Fuentes and Dalvandi were affiliated with the Keller Williams agency, but the
testimony is uncontroverted that Downing worked for these individuals and not
for the agency.  There is no evidence as to the number or proportion of hours
she worked for each employer, but it is undisputed that each employer paid
Downing a different rate.  Fuentes paid Downing no more than $12.50 per hour,
and Downing was compensated for some of the thirty hours she worked each week
at this lower rate.  And although there is evidence that Dalvandi paid Downing
$17.50 per hour, there is no evidence of the reason Dalvandi terminated
Downing’s employment.  Thus, the evidence of the extent of Downing’s economic
damages from the Burnses’ tortious interference shows no more than that she was
terminated from a job that she performed less than thirty hours per week and
for which she was paid no more than $12.50 per hour.  The amount awarded by the
jury far exceeds this.  The excess cannot be sustained as an award of
non-economic damages, because Downing presented no evidence that the Burnses’
tortious interference caused her any harm other than a temporary loss of
income.  Unlike damages for defamation per se, damages from tortious
interference are not presumed but instead must be proved.

            We therefore agree with the
Burnses that no evidence supports the full amount of damages awarded on
Downing’s tortious-interference claim.  When the evidence supports only a
portion of the damages awarded, but the record does not allow us to determine
the amount of remittitur to suggest, we must remand for a new trial.  Guevara v. Ferrer, 247 S.W.3d 662, 670 (Tex. 2007).  

E.        Scope
of Remand

            We are
left, then, with the question of the proper scope of the remand.  Because the
record does not support the tortious-interference damages awarded and we cannot
order a separate trial solely on unliquidated damages when liability is
contested, the Burnses’ liability for tortious-interference must be retried.  See
Tex. R. App. P. 44.1(b).  If
the tortious-interference claim and the defamation claims are “separable
without unfairness to the parties,” then we can remand the case with
instructions for the trial court to sever the two claims, enter judgment in
accordance with the verdict on the defamation claim, and retry the
tortious-interference claim.  We conclude however, that as litigated by the
parties, Downing’s defamation claim and the Burnses’ theft counterclaim are so
interwoven with the tortious-interference claim that they are not separable
without unfairness.

            On
appeal, Downing asks us to render judgment on her defamation claim because,
according to Downing, the jury’s findings of defamation liability and damages
are based on Don’s statement to Castillo that Downing stole his clients’
checks.  This statement was made after Fuentes fired Downing, and thus, it
could properly be separated from the tortious-interference claim.  The problem
with this argument is that the record does not identify the basis for the
jury’s findings.  Downing presented evidence of at least six statements that,
if made falsely and negligently, were defamatory.  These included Sherry’s
statements to Bernadette Hurley, Andy St. John, Mary Stuart, and Christine
Fuentes that Downing stole trade secrets or marketing material; Sherry’s
statement to Fuentes that Downing stole money or checks; and Don’s statement to
Eulalia Castillo that Downing stole clients’ checks.  Each of the allegedly
defamatory statements could have been litigated as a distinct claim with its
own damages.  See Marshall Field Stores, Inc. v. Gardiner, 859 S.W.2d
391, 394 (Tex. App.—Houston [1st Dist.] 1993, writ dism’d w.o.j.) (“Each
distinct publication of slander inflicts an independent injury from which a
slander cause of action may arise.”).  But Downing did not choose to do so. 
The jury instead was given a single defamation-liability question and a single
defamation-damage question, and neither question was identified with any
particular statement.  As a result, we cannot tell whether the jury’s
defamation findings were based on matters that could be tried separately from
the tortious-interference claim without unfairness to the parties.  

            It also would be unfair to
separate the Burns’s theft allegations from the tortious-interference claim.  Although styled as a counterclaim, the Burnses
ultimately sought no damages for Downing’s alleged theft of trade secrets.  In
effect, this “claim” was the Burnses’ defense to Downing’s
tortious-interference claim and to some of the statements on which her
defamation claim is based.  If Downing did knowingly steal trade secrets, then
Sherry’s statements to Andy St. John to that effect would not be defamatory,
and the Burnses would have established justification as an affirmative defense
to Downing’s tortious-interference claim.  On the other hand, if Sherry used
defamation to tortiously interfere with Downing’s employment by Fuentes,[12] then the Burnses
cannot rely on the affirmative defenses of justification or privilege.  See
Prudential Ins. Co. v. Fin. Review Servs., 29 S.W.3d 74, 81 (Tex. 2000)
(explaining that because there is no privilege or justification to defame
another, privilege and justification are not available defenses to a claim that
the defendant used defamation to tortiously interfere with the plaintiff’s
contract).  

            In sum, evidence of defamation was used to
support Downing’s tortious-inference claim and rebut the Burnses’ affirmative
defenses; evidence of theft was used to support the Burnses’ affirmative
defense to the tortious-interference claim.  Because these issues are not
separable without unfairness to the parties, we reverse the judgment and remand
all of the claims for a new trial. 

IV. 
Conclusion

            For
the foregoing reasons, we reverse the judgment and remand the case.

 

                                                                                    

                                                                        /s/        Tracy
Christopher

                                                                                    Justice

 

 

 

Panel consists of Chief Justice
Hedges and Justices Frost and Christopher (Frost, J., dissenting).

 









[1] The attorney’s demand
letter was offered into evidence, and it contains no threat of litigation
against anyone other than Downing.





[2] According to Downing,
Dalvandi “was not involved in this.”





[3] At trial, another of
Don’s employees testified that immediately after Downing resigned, the Burnses
learned that an option check had been associated with the wrong transaction and
mailed to the wrong client, who mailed it back to Don’s agency.





[4] This may have been the
same meeting at which Sherry and Don spoke to Fuentes; the record is not clear
on this point.





[5] The Burnses alleged a
variety of other counterclaims, but abandoned them before the trial court
submitted the case to the jury.





[6] The trial court further
stated, “As to the password information, I do make a finding that that is
protected information.”  This is not a “finding” as that term is used in Texas
Rules of Civil Procedure 296–299a.  Such findings are made only in connection
with issues that are tried without a jury, and the Burnses’ theft counterclaim
was decided by a jury.  





[7] “Libel” is simply a
defamatory statement published in a writing or other graphic form.  See Tex. Civ. Prac. & Rem. Code § 73.001. 
The same defamatory statement would be referred to as “slander” if
communicated orally.  See Randall’s Food Mkts., Inc. v. Johnson, 891
S.W.2d 640, 646 (Tex. 1995).





[8] Although the plaintiff
presented evidence of the extent of his mental anguish, the Texas Supreme Court
pointed out that the statements were defamatory per se.





[9] The jury was instructed
to “[c]onsider the following elements of damages, if any, and none other,” but
no elements of damages were listed.  But cf. Tex. Civ. Prac. & Rem. Code § 41.008(a) (West 2008 &
Supp. 2009) (“[T]he trier of fact must determine the amount of economic damages
separately from the amount of other compensatory damages.”); Arthur Andersen
& Co. v. Perry Equip. Corp. , 945 S.W.2d 812, 817 (Tex. 1997) (noting
that a charge that fails to instruct the jury on the proper measure of damages
is fatally defective).  The Burnses, however, did not object to this aspect of
the charge.





[10] The Burnses did not
object to the question.  





[11] If Downing earned $17.50
per hour, her weekly wage would be $700.00 only if she worked 40 hours per
week.





[12] Downing introduced no
evidence that Don Burns tortiously interfered with her employment.